**UNITED STATES**

v.

**James D. MABE, 262 73 0895, Machinist's Mate First Class (E–6), U.S. Navy.**

**NMCM 88 4053R.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 9 Aug. 1988.

Decided 14 May 1990.

LT Mary Anne Razim, JAGC, USN, Appellate Defense Counsel.

Maj. J.B. Gilbert, USMC, Appellate Defense Counsel.

LCDR Lawrence W. Muschamp, JAGC, USN, Appellate Government Counsel.

Before the Court En Banc.

BYRNE, Chief Judge:

Pursuant to his pleas, Machinist's Mate First Class Mabe was convicted of an unauthorized absence, terminated by apprehension, from 25 April 1988 to 17 June 1988 in violation of Article 86, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 886 and missing movement through design in violation of Article 87, UCMJ, 10 U.S.C. § 887. Tried aboard the USS FORRESTAL (CV–59) in the Mediterranean Sea by Judge Richard C. Noren, a Naval Reserve Captain military judge sitting alone, Petty Officer Mabe was sentenced to a bad-conduct discharge, reduction to pay grade E–3, and confinement for a period of 3 months. Pursuant to a pretrial agreement, confinement in excess of 30 days was suspended, but the sentence was otherwise approved by the convening authority. We affirmed.

The United States Court of Military Appeals set aside our decision and remanded this case to us "for consideration of the issue raised by appellate defense counsel" in the supplement to petition for review. *United States v. Mabe*, 28 M.J. 326, 327 (C.M.A.1989).

The supplement to petition for review submitted to our senior Court, which was the same principal issue we decided in initially affirming this case, was as follows:

WHETHER THE MILITARY JUDGE IN THIS CASE WAS SUBJECTED TO UNLAWFUL INFLUENCE REGARDING LOCAL SENTENCING PRACTICES?

The United States Court of Military Appeals discussed the issue in its opinion, in pertinent part, as follows:

On appeal Mabe has complained about a letter written by the Chief Trial Judge of the Navy to the Chief Judge of the Transatlantic Judicial Circuit. He asserts that this letter, which the military judge in this case purportedly knew about prior to trial, constituted improper influence.... He alleges that the purpose of the letter was to cause an increase in sentences for unauthorized absence in the circuit where the trial was held.

The copy of the handwritten letter which has been filed with this Court appears incomplete. In this state, we cannot fully evaluate its meaning or effect. However, it is clear that the Chief Judge was relaying complaints of some type concerning inordinately lenient sentences in the circuit during bench trials. Such a letter, without a much fuller explanation of the context, gives us grave concern....

In order for the legal issue to be evaluated, it is necessary that the record contain a complete copy of the letter, and, if that is unavailable, an explanation for its unavailability. Furthermore, we believe that it will facilitate our review if the Court of Military Review first makes findings as to why the letter was written; the nature and source of the "complaints" to which it refers; the actual or likely effect of the letter on any persons involved in the trial of this case; the actual or likely effect of the letter on other cases tried in the same circuit or elsewhere in the Navy; and to express its conclusions as to what remedial action, if any, is required. The procedure in *United States v. DuBay*, 17 U.S.C. M.A. 147, 37 C.M.R. 411 (1967), may be utilized if deemed appropriate.

In compliance with our higher Court's opinion, we ordered the Government to obtain answers, under oath, to questions we generated to respond to the Court's concerns. Questions were submitted to all those who could provide us with relevant information, including all Circuit Military Judges in the Navy–Marine Corps Trial Judiciary. Upon receipt of all responses, we ordered briefing from appellate counsel on the unlawful influence issue and re-

quested proposed responses to the specific queries of our higher Court. In response, appellate defense counsel asserted she could not respond to some of the queries without further inquiry of Chief Judge Garvin and requested further discovery. We ordered that written depositions be obtained from Chief Judge Garvin.

## I. THE MEMORANDUM FROM CHIEF JUDGE GARVIN TO CIRCUIT JUDGE HENDERSON

OFFICE OF THE CHIEF JUDGE

NAVY-MARINE CORPS
TRIAL JUDICIARY

BLDG. 200-4, WASHINGTON
NAVY YARD

WASHINGTON, D.C. 20374-2004

Date: 22 Jun 88

MEMORANDUM

To: Captain Henderson

Bill,

I have a great reluctance to write this note to you, but I know you are true Navy through & through and that you would want someone to share pertinent information with you. The subject is sentencing. As you should be aware I examine *every* court-martial case report submitted from the field. In many instances I am surprised and sometimes shocked by judge alone sentences but I seldom say anything about the sentence as I do not want to chill the independence of field judges.

However, I must share with you that your circuit—across the board—is the forum of choice for an accused. You advise me that ships operations in the Med are ongoing at such a pace that we must respond to trial requests immediately since movements and future port calls are unpredictable. In that tempo of activity, I should believe that UA is a *serious* offense—much more so than in other areas of the world. However, in May no Transatlantic UA offender earned a BCD; several offenders received no reduction in rate and petty officers, in some instances, were still petty officers after their convictions.

Bill, I know you must wonder what is going on at my office—and you must be asking why I'm targeting your circuit for improvement. Believe me—my concern is strictly professional. First, yours is by far the largest travel budget in the judiciary; therefore it is a prime target for saving by achieving greater efficiency. Second, I am receiving grumblings from the Med regarding sentences. When that happens across the board, e.g. not a comment regarding an unusual case, we must ask ourselves whether the judiciary is in fact administering justice in support of overall good order and discipline?

My concern, of course, is the perception of the judge's role in military justice, in general, and more specifically the perceptions dominant in the community concerning the judiciary as a whole—and the circuit as a piece of that whole.

What you do, of course, is a matter completely within your discretion and control but I'd be remiss if I did not advise you that the growing perception is that the judiciary may be leaning toward a definite defense orientation vice a fair and impartial tribunal which takes into account the needs of all parties in interest, including the government and the victim (when there is one). I know you and your troops are dedicated to doing the job right & I want to help & to support you to the fullest, that's why I elected to communicate by this informal note vice "officially."

There are times when each of us needs someone to say something that causes us to reevaluate what we are doing. That's my purpose today. I want to advise that there is dissatisfaction & criticism (and it *is not* Ed!) and permit you to do your own reevaluation of the situation. I know it is a tough job to fairly balance the interests of everyone involved in military justice but that's what judges are supposed to do. When we tilt to [sic] far in any direction, someone inevitably calls it to our attention & we reexamine. That's it in a nutshell.

Keep pitchin' friend. It's a tough job—I do realize that. My purpose is to ensure

we all improve and do it better—not necessarily easier—just better.

Regards,

Ron

P.S. I've attached a recent E–Mail to give you the flavor of budgeting here in WASH!!!

## II. SUBSEQUENT EVENTS

Judge Henderson, after receipt of Chief Judge Garvin's letter on 30 June 1988, disclosed the letter to the other judges in his circuit and then, on 1 July 1988, notified the Judge Advocate General (JAG), who is Chief Judge Garvin's immediate superior and his "reporting senior," and the Deputy Judge Advocate General of the contents of the Garvin letter and advised them that he intended to disclose the contents of the letter to counsel appearing before him. Judge Henderson also assured them that the letter would have no effect on him. Judge Henderson stated in his interrogatory:

Prior to the next case I tried, I disclosed the letter to participating counsel immediately prior to trial and continued that practice until all counsel in the Circuit were aware of the letter and its contents. I disclosed the letter to counsel to assure them that I would not be affected by it and to invite voir dire.

The letter soon became public knowledge within the Circuit. When reserve judges came on active duty and when CAPT [Sel.] Lawrence relieved CDR Stonier they were shown the letter and told to expect voir dire regarding it. I also explained my position regarding the letter having no effect on my decisions, and I believe I suggested that they make a matter of record their intentions to disregard the letter and decide the cases independently.

Chief Judge Garvin, in a memorandum to the JAG dated 6 July 1988, stated, *inter alia:*

1. The mobile trial team concept causes us to expend about 30% of the Judiciary travel budget to try less than 2% of the Navy–Marine General and Special Courts–Martial.

a. Some cases are very expensive; for example:

1. A recent UA SPCM in Bahrain at a cost of about $8,000—$2,000 each for the judge, two counsel and a court reporter.

2. Trials at tourist areas when the ship is in port, i.e., Marseilles, France, the island of Majorca and the French Riviera.

b. I must ask if we can continue to do this when we face decreasing budgets; these are not trials for serious *criminal* offenses; the ships usually visit Rota or Naples within weeks of the trial date; there is a minimum of advance notice.

c. Furthermore, a substantial number of these trials result in little more than mast-type punishments, e.g., reductions and forfeitures with little confinement and no discharges. Little or no advance notice means travel is usually by the most expensive mode available. Without advance planning, we are not taking advantage of military flights, BOQ lodging, nor scheduled transportation by rail.

2. Admiral Steele of the CINCUSNAVEUR staff has commented that persons tried and convicted of serious military offenses have not lost Petty Officer status. He is right, as sentences in the Med are unusually light. I have asked Bill Henderson to examine sentencing within the circuit and assess if they assist maintaining good order and discipline in the area *assuming* the accused was found guilty.

3. Henderson does not like my questioning his travel expenses, scheduling of cases at remote sites or sentencing. In his words, nobody ever questioned him before! I have advised that I care, I do look at travel, offenses, sentencing, etc., and that I will ask questions to ensure he and I constantly seek better and more cost effective ways to deliver quality judicial services in a timely manner.

. . . .

6. I am about ready to recommend that we cut back one judge in the Med. My

rationale is that if we have fewer judges they will have more work to do and that will cut down the time they spend complaining and the time they devote to personal interests.

7. This is a touchy situation because of some very fragile egos, but I feel firm management attention is in order. The Judiciary must continue to provide responsive services but we must work hard to do so more economically.

. . . .

Sometime prior to 29 July 1988, Judge Henderson received a telephone call from Colonel Mitchell, the Assistant Judge Advocate General for Military Law. Colonel Mitchell proposed that to alleviate the problem caused by Chief Judge Garvin's memorandum to Judge Henderson, the Judge Advocate General would advise Judge Henderson that his actions in disregarding the letter were appropriate and that Chief Judge Garvin would no longer be Judge Henderson's reporting senior for fitness report purposes. Chief Judge Garvin, in a memo for the record dated 1 August 1988, stated the following:

The letter of 22 [June] 88 was written as the 0-in-C of the Navy–Marine Corps Trial Judiciary (Judiciary) to call the circuit judge's attention to the fact that sentences within his circuit were out of the norm when compared with other Judiciary circuits. I am the only person within the Judiciary who has a feel for sentencing uniformity or disparity because I review every case report from the field as they are received by my office. Without getting into specific cases I attempt to advise circuit judges when I determine a trend may be evolving that amounts to a definite disparity from the "norm" or reasonable expected outcome.

I must emphasize that I do not do this for the isolated case, nor do I address the issue unless I feel a trend is emerging. My comments are normally oral as I can use the phone to talk to most of the circuit judges, however it is sometimes difficult to call overseas offices. In this instance I sent Capt Henderson a *handwritten* memorandum in which I set the tone by advising that "... I seldom say anything about the sentence as I do not want to chill the independence of field judges." I then went on to advise Judge Henderson that his would be the circuit of choice for an accused who has been found guilty when it came to sentencing.

My action was taken to ensure that the court-martial process, in the MED, continues to be a viable tool for the maintenance of good order and discipline by advising the supervisory judge to reexamine the situation and then do what his conscience dictated. I did advise that sentences within the circuit appear to be defense oriented to the exclusion of the interests of the government and victims. However I did not advise or state that sentences must become more severe. I merely advised Judge Henderson that my hand-written memorandum was my way to talk to him and urge him to reexamine the issue and determine in accordance with his own conscience *IF* adjustments should be made.

In conclusion, I must point out that I expect Judge Henderson, as any other circuit judge, to administer his circuit. That is the responsiblility of the circuit judge who is in the chain-of-command of the Judiciary. If he or any other person with designated management authority or administrative control cannot or will not exercise the authority vested in them, I loose [sic] my confidence in their ability to perform. Lastly, I am astonished that a Naval officer would categorize a counseling session by his reporting senior as an attempt at illegal command influence when he was not told nor ordered to do anything other than "think" about a problem and responsibly do what his conscience dictated.

A Naval message from the JAG was received by Judge Henderson on 23 September 1988 and stated, *inter alia,* that Judge Henderson was to disregard all portions of Chief Judge Garvin's memorandum of 22 June 1988 "which in any way relate to sentencing or suggest to you that certain sentences or judicial philosophies are incompatible with Navy goals."

On 2 August 1989, after the case was returned to us by the Court of Military Appeals, this Court issued interrogatories for Chief Judge Garvin to complete, and received, *inter alia*, the following responses:

1. Identify the nature and source of the complaints to which your letter of 22 June 1988 to Captain Henderson refers.

A. The complaints I referred to in my informal, handwritten MEMORANDUM of 22 June 88 were essentially my own as based on my analysis of *all* court-martial case reports from all the TRIJUDIC judges throughout the world. My impression of what was happening in the Med is summarized in the first two paragraphs of the memo. My personal review of *ALL* case reports from the field gave me the distinct impression that trials in the MED resulted in sentences that were significantly out of the norm—on the lenient side. This is reflected in my summary of the second paragraph.

I was being advised by CAPT HENDERSON that they were trying very serious cases in the circuit, yet the sentences I saw were much lighter than apparently comparable cases tried elsewhere. The grumblings I mentioned in the third paragraph essentially stemmed from my conversations with my own staff (Washington Office) and perhaps a couple of phone conversations I had with lawyers familiar with the status of things in the Med. Those conversations may have included CAPT HOSKEN, the CO, NLSO Naples and someone in JAG Code 20, but I cannot be sure of that. I honestly do not remember anything other than that as forming a basis for my memo.

2. With whom did you discuss those complaints before drafting the letter?

A. As stated in the foregoing paragraph, any discussions regarding what was happening in the Transatlantic Circuit were restricted to my office and the immediate staff. Essentially, *we* were the complaining parties as we were searching for the right method of bringing spending under control to the extent that we felt certain that we could try all cases in a timely, *but* cost-efficient manner.

Chief Judge Garvin also stated that in a visit to the Transatlantic Circuit in September of 1988, he discussed, *inter alia*, the "inappropriateness" of Judge Henderson's response "to a private, personal memo from me, his boss," with the new judge in Rota, with Judge Henderson, and the Commanding Officer of the Naval Legal Service Office in Naples, Italy.[1]

In response to an interrogatory from this Court, Colonel Mitchell, Assistant Judge Advocate General (Military Law), discussing a conversation he held with Chief Judge Garvin in July/August 1988, as part of an inquiry into the memo on behalf of the Judge Advocate General, stated, *inter alia:*

As I recall, Chief Judge Garvin told me that an admiral acquaintance of his stationed in either London or Spain had communicated to him for information purposes that there was "some" dissatisfaction with some sentences in the Mediterranean, the location of the Transatlantic Circuit. The admiral had not asked that any action be undertaken. Chief Judge Garvin said that he, and the general public, had been thinking generally about sentence disparity. He thought about creating a table of adjudged sentences and making it available to judges for their information. Chief Judge Garvin said that sometime after getting the information from the admiral, he was wr[iting] a personal note to Judge Henderson on financial and management issues. Chief Judge Garvin said that when he began to write the note, he decided to address apparently light circuit sentencing and to request that Judge Henderson review the matter as his conscience dictated. Chief Judge Garvin said he believed that as the Chief Judge he could rightly ask him to do that

---

1. Its contents, and not the personalized nature of a memo, make it "official." *See United States v. Kitchens,* 12 U.S.C.M.A. 589, 31 C.M.R. 175 (1961).

as long as he did not mandate any action or result. I also have the impression that he said that it was preferable for the judiciary to discuss such matters than to encourage commanders to discuss such matters directly with trial judges. In the note to Judge Henderson, Chief Judge Garvin vaguely alluded to command "grumbling" in the Med. He denied any intent to compel Judge Henderson or any other judge to change any findings or sentencing views or practices. He also said that he had insufficient insight into cases to assess circuit findings or sentencing.[2]

On 3 October 1989, this Court requested appellate counsel to brief the command influence issue and also requested counsel to specifically address the queries that the Court of Military Appeals requested us to answer when they set aside our decision and remanded the record to us. Appellate

defense counsel, in response, stated, *inter alia,* that she had made "reasonable inquiry into this matter and believes that one or more letters or documents exist which bear directly upon any complete answer to parts (a) and (b) of the first Specified Issue" (*why* Chief Judge Garvin wrote to Judge Henderson and what were the *nature and source* of the "complaints" to which Chief Judge Garvin's letter refers). Continuing, appellate counsel stated that Chief Judge Garvin had "made no mention of the information contained therein, thus necessitating further discovery." We granted the defense motion to compel additional discovery in the form of a deposition of Chief Judge Garvin.

At the deposition, in response to the request to describe fully the specific complaints which he referred to as "grumblings from the Med," Chief Judge Garvin responded:

**2.** Colonel Mitchell was the sole designee to a Judicial Commission appointed by the Judge Advocate General to investigate this matter. In the Statement of Opinions within his judicial commission report, Colonel Mitchell opined:

1. That Captain GARVIN, by invoking operational command opinion regarding the quality of Transatlantic Circuit sentencing, unintentionally created the specter of command influence being brought to bear on the Circuit.
2. That Captain Garvin did not intend his note to have such an effect, but the poorly chosen words used to explain the reasons for his note obfuscated rather than clarified his purpose. The informal medium of a handwritten personal note plus Captain Garvin's belief that he could, as Chief Judge, lend guidance and direction to the judiciary contributed to the loose wording of the note.
3. That Captain Henderson's performance has not been affected by the note. His judicial decisions have not been influenced by the note. Other judges in the Circuit were insulated by Captain Henderson's guidance, as Circuit Judge and their reporting senior.
4. That Captain Garvin did not violate Articles 37, 98, 133, 134 or any other article of the UCMJ. The appearance of command influence was inadvertently, and not deliberately, created. There being no mens rea, there is, in my opinion, no criminal misconduct in this case.
....
6. Because of the extant perceptions of command influence created by the note, JAG action is required to ameliorate the impact of the Chief Judge's note on future cases in the Circuit, notwithstanding the timely action of Judge Henderson, and to secure a clear policy

statement regarding the independence of judicial deliberations.
In September of 1988, Rear Admiral Campbell sent a message to Circuit Judge Henderson in response to Judge Henderson's 1 July 1988 message to the Judge Advocate General stating, *inter alia:*
2. As discussed informally during telephone conversation with Colonel Mitchell this office and memorialized in Ref C, you are directed to disregard all portions of Ref B which in any way relate to sentencing or suggest to you that certain sentences or judicial philosophies are incompatible with Navy goals.
3. As you are well aware, I expect you as a Naval Officer, Judge Advocate and Military Judge, to exercise your sole and independent judgment and discretion in all matters, but nowhere is that more important than in your present position as military judge when determining an appropriate sentence.
4. As a further precaution to ameliorate any appearance of outside influence as a result of Ref B, Captain Garvin will no longer be your reporting senior for fitness report purposes.
5. RADM Campbell sends.
Although Judge Henderson's subsequent fitness report was signed by the Judge Advocate General (JAG), we note: (1) Chief Judge Garvin, after a telephone conversation with the Judge Advocate General, provided input to the JAG critical of Judge Henderson for the preparation of that fitness report and (2) in our opinion, Judge Henderson received a fitness report from the JAG that may be characterized, at best, as mediocre. (We note that the critical input by Chief Judge Garvin did not address in-court judicial discretion matters.)

The term that I used, "grumbling from the Med", was poetic license, to best describe it. The "grumblings from the Med" were based upon conversations essentially generated in my own office involving my own staff based upon an analysis of case reports that we were receiving from the Med. Looking at those, my use of that language in my informal communication to Captain Henderson was an attempt to get him to think about what was happening over there. I didn't really have any specific complaints from individuals.... To the best that I can recollect, prior to that June letter to Captain Henderson there may have been two instances of conversations with specific people. They may not have happened. I don't really remember. I may have talked with Captain Hosken, Ed Hosken, who was the Commanding Officer of the Legal Service Office, Naples. Whether or not he had anything to say about sentences, I don't honestly recall.

At the previous time I gave a written sworn statement in this case, I was not aware of the fact but in reviewing my file I think there was also a letter from either CINCUSNAVEUR or United Activities London or something like that. Admiral Steele, I think, wrote the letter because his name appears in one of my memorandums. In that letter, as I recall, and I can't find the letter unfortunately. I've searched my files high and low; can't find it. As I recall the Admiral said you ought to really look at what's going on over here because in one case there was a petty officer that was absent for a number of months, four, five, six months—I don't recall, and was not reduced from petty officer status. That may have preceded—probably preceded my letter to Henderson, but it was not a factor in my making the description of my concern as "grumbling from the Med". Go back to what I said earlier, the "grumbling from the Med" were basically my own analysis of everything that I saw coming in on the case reports, because I review all case reports from every trial. The two specific complaints,

if they were, would have been with Captain Hosken and that communication I got from Admiral Steele.

DO [Deposition Officer]: Very well, to the extent that you have not already answered, specify which complaints were made orally or by telephone and which complaints were in writing.

A. Nothing by telephone—well, I guess it is by telephone, my conversation with Captain Hosken. Orally, again, I may have had some conversations with individuals in Code 20, Office of the Judge Advocate General. I don't honestly recall whether anybody in that code discussed sentencing over there with me or not, and if they did, I just don't remember who it may have been. The other communication I had was the letter from Admiral Steele, and he was either CINCUSNAVEUR or United Activities London or whatever his title was—Naval Activities London.

Chief Judge Garvin, in response to numerous other questions propounded, reiterated that all comments in his memorandum were based on his analysis of the case reports. As regards the particular petty officer mentioned in Admiral Steele's letter, Chief Judge Garvin asserted he had "picked up on that long before I received his [Admiral Steele's] letter." In elaboration, he stated, "As I recall my reaction to that particular offense was to run into my admin office screaming 'How the hell can this happen in my Navy.'" Chief Judge Garvin again also denied that he expected Judge Henderson and his subordinate judges to increase the severity of the sentences based upon his memorandum.

About a month after Chief Judge Garvin's deposition, the appellant filed with this Court a letter, dated 25 May 1988, from the Commander, U.S. Naval Activities, United Kingdom (COMNAVACTSUK) addressed to the Chief Judge of the Navy–Marine Corps Trial Judiciary. The letter expressed the dissatisfaction of that convening authority over the sentence adjudged by Judge Henderson in the case of *United States v. Derring*, tried on 12 May

1988. The second paragraph of the letter warrants verbatim recitation:

> The sentence adjudged failed to correlate to the seriousness of the crimes committed by Petty Officer Derring. No significant extenuation or mitigating circumstances were presented by the defense. It is virtually impossible for me to understand how the Judge could be so lenient. In my opinion, an E–5 sailor who abandons his unit for three months has no right remaining a Petty Officer, unless the circumstances surrounding the offense were quite extraordinary or his record was particularly outstanding. Neither of the latter factors applied in this case. Compounding the seriousness of the UA offense was the sailor's indiscriminate writing of bad checks while he was in a UA status. I cannot conceive of how any Naval officer could award a sentence so clearly disproportionate to the offenses.

This command letter was sent via the Commander in Chief, U.S. Naval Forces, Europe (CINCUSNAVEUR). On 6 June 1988, Rear Admiral Steele, Chief of Staff, forwarded the letter by first endorsement noting that "it appears that Commander, U.S. Naval Activities, United Kingdom is in the proper execution of his office in expressing his concern that justice was not well served in this instance." The letter was "forwarded for consideration and whatever disposition is considered appropriate."

We ordered the Government to produce the *Derring* case report and advise this Court as to when the report was received in the Office of the Chief Judge of the Navy–Marine Corps Trial Judiciary. Appellate Government counsel responded that the *Derring* case report "was apparently never received in the Office of the Chief Judge of the Navy–Marine Corps Trial Judiciary, according to the administrative officer of that activity, who has made a search for the same at the Government's request." Appellate government counsel then obtained, from the Circuit, a copy of the case report made by Judge Henderson dated 17 May 1988.

## III. OUR COURT'S FINDINGS

Considering all the evidence we have before us, we find the following:

1. Command judge advocates, convening authorities, the Commanding Officer of the Naval Legal Service Office (NLSO) in Naples, Italy, and the Officer–In–Charge of the NLSO Detachment in Rota, Spain, informally complained or otherwise shared their concerns about the "lenient" sentencing of at least two of the three trial judges in the Transatlantic Judicial Circuit, which served their area.

2. The concerns expressed by these officers served by the Transatlantic Judicial Circuit surfaced at the Office of the Chief Judge of the Navy–Marine Corps Trial Judiciary, most likely from the Commanding Officer of the Naval Legal Service Office in Naples directly to the Chief Judge.

3. Commander Naval Activities United Kingdom (COMNAVACTSUK) wrote a letter to the Chief Judge via Commander–in–Chief U.S. Naval Forces Europe (CINCUSNAVEUR) expressing great dissatisfaction with the sentence adjudged by Judge Henderson in the case of *United States v. Derring*.

4. COMNAVACTSUK's dissatisfaction stemmed from his belief that, absent other extraordinary circumstances, the sentence was too lenient for a Petty Officer that was found guilty of an unauthorized absence of three months.

5. CINCUSNAVEUR forwarded COMNAVACTSUK's letter to the Chief Judge for appropriate action.

6. Other "grumblings" were received by the Chief Judge's staff and/or the Military Justice Division in the Office of the Judge Advocate General.

7. The "grumblings" were passed to the Chief Judge.

8. Chief Judge Garvin, through his personal review of individual court-martial case reports from the Transatlantic Judicial Circuit and his receipt of one or more complaints from that area shared the perception that sentences within that circuit were too lenient.

9. Chief Judge Garvin wrote the personal memorandum to Circuit Judge Henderson a few weeks after the COMNAVACTSUK letter was written.

10. The Chief Judge's memorandum included comments on sentencing and offenses that corresponded to the contents contained in the COMNAVACTSUK letter.

11. The COMNAVACTSUK letter provided support for Chief Judge Garvin's belief that sentencing was lenient in the Transatlantic Judicial Circuit.

12. The Office of the Chief Judge could not locate the *Derring* court-martial case report.

13. Chief Judge Garvin's memorandum was written, at least in part, as a result of receipt of the COMNAVACTSUK letter.

14. Chief Judge Garvin's memorandum to Circuit Judge Henderson was written to encourage Judge Henderson and the other judges in the Transatlantic Judicial Circuit to increase the severity of their sentences. One of the secondary reasons was to better manage scarce judicial assets in the circuit.

15. The judges of the Transatlantic Judicial Circuit perceived Chief Judge Garvin's memorandum to Judge Henderson as an attempt by their military superior to superimpose his personal judgment, influenced at least in part by disgruntled convening authorities, over the exercise of their independent judicial responsibility and discretion.

16. Consequently, each of the judges of the Transatlantic Judicial Circuit was subjected to unlawful command influence.

17. The military judge in appellant's case, Judge Noren, was a Naval Reserve Captain on active duty for training for two weeks at the time he presided at appellant's court-martial.

18. Judge Noren read the Chief Judge's memorandum to Judge Henderson.

19. Judge Noren was subjected to unlawful command influence.

20. Judge Noren fully advised appellant and his defense counsel that he had read the Chief Judge's memorandum to Circuit Judge Henderson.

21. Appellant was given full opportunity to *voir dire* and challenge Judge Noren.

22. Appellant's trial defense counsel conducted considerable *voir dire* of Judge Noren, declined to challenge him, and appellant pled guilty to the charged offenses.

23. Appellant elected trial by military judge alone with Judge Noren presiding.

24. Appellant's post-trial affidavit is self-serving and unworthy of belief.

25. Appellant did not, as he asserts in his affidavit, choose trial by military judge alone on the basis that regardless of the forum he elected, he could not receive a fair trial because the entire circuit or judiciary had been unlawfully influenced and such influence could not be overcome.

26. The unlawful command influence to which the military judge was subjected neither affected appellant's decision to plead guilty nor to be sentenced by the military judge, Judge Noren.

27. The Chief Judge's memorandum had no effect on the findings or sentence in appellant's case.

28. Counsel for appellant maintained confidence in the integrity and fairness of the individual judges within the Transatlantic Judicial Circuit.

29. No evidence within the record exists to suggest that sentences within the Transatlantic Judicial Circuit or within the Naval Service have increased in severity.

30. Those judges and counsel who read the memorandum or who became aware of its contents were disillusioned with the attitude of the Chief Judge of the Navy–Marine Corps Trial Judiciary.

31. No loss of confidence by all other counsel practicing within the Transatlantic Judicial Circuit in the integrity of the individual military judges within the Transatlantic Judicial Circuit is apparent.

32. The evidence currently before the Court reveals that Chief Judge Garvin's memorandum did not adversely impact upon other cases tried within the Naval Service.

33. Circuit Judge Henderson immediately reported the Chief Judge's memorandum

and his concern about its contents and intent to the Judge Advocate General.

34. The Judge Advocate General advised Circuit Judge Henderson to disregard any portions of the Chief Judge's memorandum referring to sentencing.

35. The Judge Advocate General substituted himself for the Chief Judge as Circuit Judge Henderson's reporting senior for purposes of performance evaluation.

## IV. ANALYSIS

Congress, in adopting Articles 26(c) and 37(a) of the Uniform Code of Military Justice, 10 U.S.C. §§ 826(c), 837(a), sought to insulate military judges from command interference with the deliberative process. *Cf. United States v. Ledbetter*, 2 M.J. 37, 42 (C.M.A.1976).

In *Ledbetter*, an Air Force military judge submitted a post-trial memorandum to the Court of Military Appeals, apparently while the case was under review by that Court. The military judge stated that he received telephone calls from the Judge Advocate General of the Air Force, the Chief of the Air Force Trial Judiciary Division and his assistant.[3]

The callers asked the trial judge to explain his reasoning for the particular sentence imposed in certain cases, one of which was Ledbetter's. The calls were made to respond to present and anticipated future command concern about the sentences adjudged in those cases. At one point, regarding one case, the trial judge stated that the Judge Advocate General "asked me why. I didn't at least sentence Mungin to a $50.00 forfeiture just for appearances sake." *Id.* at 46.

The Court of Military Appeals quoted a portion of UCMJ, Article 37(a):

No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial ... or any member thereof,

in reaching the findings or sentence in any case.

*Id.* at 42.

The Court then noted that the "trial judge, as an integral part of the court-martial falls within the mandate of Article 37." *Id.* Further, inquiries from officials such as The Judge Advocate General of the Air Force, the Chief of the Trial Judiciary Division, or his assistant "which question or seek justification for a judge's decision" are barred unless made by an independent judicial commission. *Id.* at 43. The Court noted:

Article 26(c)'s provision for an independent trial judiciary responsible only to the Judge Advocate General certainly was not designed merely to structure a more complicated conduit for command influence.... The Judge Advocate General and his representatives should not function as a commander's alter ego but instead are obliged to assure that *all* judicial officers remain insulated from command influence before, during, and after trial.

*Id.* at 42.

The independence of military judges, ensured by statutory and Manual[4] protections, is the principal defense against unlawful command influence within the military justice system. Even though Chief Judge Garvin may have held a long-standing opinion that Judge Henderson's sentencing practices reflected a judicial philosophy which was "defense oriented" to the exclusion of the interests of the Government and victims, the fact is that his memorandum to Judge Henderson was not written until complaints of Judge Henderson's sentencing practices were received from convening authorities and senior Judge Advocates located within the Transatlantic Judicial Circuit. The danger of the memorandum was that it threatened to deprive accused facing court-martial within the Transatlantic Judicial Circuit of an impartial sentencing forum, because the military judges within that Circuit had been put on

---

**3.** We note that the Trial Judiciary Division is a division within the Office of The Judge Advocate General of the Air Force.

**4.** *See, e.g.,* R.C.M. 801.

notice that their sentencing practices were viewed by the Chief Judge of the Trial Judiciary to be inadequate to serve the "goals of the Navy." *Cf. United States v. Thomas*, 22 M.J. 388 (C.M.A.1986).

■ Judicial integrity and the fairness of the military justice system are placed in question when there is, or it is perceived there is, a pattern of partiality favoring one of the parties to the proceedings. It is a judge's responsibility to uphold the integrity and independence of the judiciary and to perform his judicial duties impartially and diligently. American Bar Association Model Code of Judicial Conduct, Canons 1 and 3. A judge must not manifest bias on any basis, be it on findings or sentence. *Discussion*, R.C.M. 801(a). Accordingly, it is entirely appropriate for a Chief Judge, or any other supervising judge, to be concerned with upholding the judiciary's integrity and ensuring its reputation for impartiality. Such a responsibility, however, must be exercised with caution so that the independence of an individual judge or the judiciary as a whole is not jeopardized. Therefore, a fine line exists between the exercise of proper *judicial* supervision and the exercise of unlawful command influence. The targeting of an individual judge, circuit, or case is inappropriate. Where a judge develops a pattern of judicial decision-making that raises concerns with a supervising judge and such concern can be equated to concern for judicial competency, then the judge's conduct should be made the subject of careful investigation by a judicial commission to determine the propriety of the judge's conduct. *Ledbetter*, 2 M.J. at 43; American Bar Association, *Guidelines for the Evaluation of Judicial Performance*, Part III, Guideline 3-1 (August 1985); Stern, *Is Judicial Discipline in New York State a Threat to Judicial Independence?* 7 Pace L.Rev. 291, 305-322 (Winter 1987).[5] Where such a pattern

involves sentencing and it relates to a specific type of offense and the supervising judge is aware of community concern, it is not inappropriate for the supervising judge to bring legitimate concerns, when appropriate, to the attention of the judiciary as a whole, as for example, through general discussions at judicial seminars. *See United States v. Littrice*, 3 U.S.C.M.A. 487, 13 C.M.R. 43 (1953); Ross, "Extrajudicial Speech: Charting the Boundaries of Propriety," Vol. II, No. 3, Geo.J. of Legal Ethics 589, 630 (1989). But, any attempt by a supervising judge to influence an individual judge or circuit to increase or decrease the severity of sentences by expressing dissatisfaction with the sentence adjudged for certain offenses or in individual cases is unlawful command influence and is a violation of Article 37, UCMJ. *Ledbetter*, 2 M.J. 43, 44-52. *See Thomas*, 22 M.J. at 393. Unlawful command influence also occurs when a supervising judge relates to an individual judge or circuit the criticism or dissatisfaction expressed by commanders or their representatives about the individual judge's or circuit's findings or sentence for certain offenses or in individual cases. *See id.; Littrice*, 13 C.M.R. 43. A supervising judge, and particularly the Chief Judge, cannot preserve the integrity and independence of the judiciary if he is, or is perceived to be, a conduit for commanders. *See* Military Justice Act of 1968, 82 Stat. 1335 (1968); JAGINST 5813.4 (1962); JAGINST 5813.4A (1969).

## V. HOLDING

■ Unlawful command influence occurred in this case because we have concluded that the

judges of the Transatlantic Judicial Circuit perceived Chief Judge Garvin's memorandum to Judge Henderson as an attempt by their military superior to su-

---

5. We recognize that this is a very delicate area that, if abused, can greatly jeopardize the independence of the judiciary. In most state and federal jurisdictions "wrong decisions—even very wrong decisions—" cannot be the subject of discipline and if a complaint is filed that directly relates to the merits of a decision or procedural ruling it must be dismissed. *See*

Federal Judicial Center, *Illustrative Rules Governing Complaints of Judicial Misconduct and Disability*, at 3 (1986); Stern at 305-322. Additionally, it is critical to remember that sentencing within the military justice system is not only individualized but is entirely within the discretion of the sentencing authority, be that authority the military judge or court members.

perimpose his personal judgment, influenced at least in part by disgruntled convening authorities, over the exercise of their independent judicial responsibility and discretion.

We hold that Chief Judge Garvin's memorandum became a vehicle for the transmission of unlawful command influence. *Ledbetter*, 2 M.J. at 42; *Thomas*, 22 M.J. at 393.[6]

## VI. CONCLUSION

The Court of Military Appeals asked this Court to make findings as to (1) why the memorandum was written; (2) the nature and source of the "complaints" to which it refers; (3) the actual or likely effect of the memorandum on any persons involved in the trial of appellant's case; (4) the actual or likely effect of the memorandum on other cases tried in the same circuit or elsewhere in the Navy; and (5) to express our conclusions as to what remedial action, if any, is required. *United States v. Mabe*, 28 M.J. at 327.

■ We now answer the specific questions posed by our senior Court as follows: (1) the memorandum was written primarily to encourage the judges of the Transatlantic Judicial Circuit to increase the severity of their sentences but also to better manage judicial assets; (2) area commanders and their legal advisors were the genesis of the complaints due to their dissatisfaction with the leniency of the sentences adjudged; (3) the memorandum caused disillusionment among the judges and counsel of the Transatlantic Judicial Circuit but no person involved in appellant's case, including appellant, was actually or likely adversely affected by the memorandum;[7] (4) there was no actual or likely adverse effect upon other cases tried in the same circuit or elsewhere in the Navy as a result of the memorandum; (5) and because of the immediate action of Circuit Judge Henderson, the response of the Judge Advocate General, and the full disclosure by the judges of the circuit to counsel and accused, the unlawful command influence did not result in an unfair trial for the appellant. No further remedial action is required.

■ As unlawful command influence has been exercised in Mabe's case, we may not affirm unless we are persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence. *Thomas*, 22 M.J. at 394. We are convinced beyond a reasonable doubt that the findings and sentence in appellant's case were unaffected by the unlawful command influence.

The findings and sentence as approved by the convening authority are correct in law and fact and are affirmed. The record of trial is to be forwarded to the Court of Military Appeals in accordance with their order.[8]

Senior Judge ALBERTSON and Judges WILLEVER, JONES, HILTON, AND RUBENS concur.

Senior Judge McLERAN did not participate.

---

**6.** It is also noteworthy, in this regard, that after receiving the Judicial Commission Officer's report of this incident, the Judge Advocate General of the Navy specifically directed Judge Henderson to "disregard" all portions of Chief Judge Garvin's memorandum "which in any way relate to sentencing or suggest to you that certain sentences or judicial philosophies are incompatible with Navy goals." Judge Henderson was to exercise "sole and independent judgment and discretion in all matters, but nowhere is that more important than in your present position as military judge when determining an appropriate sentence." The Judge Advocate General stated that because of the memorandum, Chief Judge Garvin would no longer be Judge Henderson's reporting senior for fitness report purposes. *See* footnote 2, *supra*. Consequently, by his actions in this case the Judge Advocate General implicitly concluded that Chief Judge Garvin's memorandum created a perception on the part of the recipient that convening authorities' views were reflected in the memorandum. Also implicit in the Judge Advocate General's message to Judge Henderson is that the management aspects of Chief Judge Garvin's memo were appropriate.

**7.** We note Judge Noren tried to dissuade Petty Officer Mabe from stating he desired a bad-conduct discharge rather than reduction to a pay grade below E-6. *See* R. 65-67.

**8.** Appellate defense counsel's Motion to Seal Documents is denied.

**1268**

FREYER, Judge (concurring in the result):

The Court has concluded that Chief Judge Garvin's memorandum to Circuit Judge Henderson (herein referred to as the "Henderson memorandum") subjected each of the judges of the Transatlantic Judicial Circuit, as well as the visiting judge who presided over this case, to unlawful command influence. Its conclusion differs from that reached by Colonel Mitchell, whom the Court characterizes as "the sole designee to a Judicial Commission appointed by the Judge Advocate General to investigate this matter," who opined that Chief Judge Garvin had not violated Article 37 nor any other article of the Uniform Code of Military Justice. I find myself in agreement with Colonel Mitchell's conclusion that no Article 37 violation was committed by Chief Judge Garvin.

This case is important, both for the personal reputations at stake and for the fundamental principles of the military justice system which it places in issue. After 21 years of active involvement with military justice, I quite naturally hold certain personal opinions about many aspects of the military justice system; as a judge, however, and especially a judge of an intermediate appellate court, I have a responsibility to the parties and others who may be affected by our decision in this case to apply the law exactly as I find it, to the best of my ability. Through extrapolation of a dictum in the 2–1 decision in *United States v. Ledbetter*, 2 M.J. 37 (C.M.A.1976), to the virtual exclusion of the traditional lines of decisional and statutory law by which Chief Judge Garvin was expected to conduct himself and is now entitled to have his conduct judged, the Court reaches its conclusions without dealing with what, for me at least, are the hard questions in the case and, thus, leaves the Chief Judge of the U.S. Navy–Marine Corps Trial Judiciary with a rebuke but little practical guidance as to what his supervisory responsibilities are or how he may permissibly exercise them. Moreover, by failing to distinguish adequately between, on the one hand, judicial misconduct or incompetence, and, on the other, gradations of judicial performance not amounting to either misconduct or incompetence, the Court neglects altogether the implications for judicial independence of routine judicial performance evaluation. In so doing, it leaves open a "back channel" which substantially nullifies the effectiveness of its own decision as a means of enhancing judicial independence, and its decision could actually worsen the predicament of the trial judiciary. Accordingly, I feel obliged, if not to solve all these problems, at least to address them, so that they may be squarely presented for authoritative resolution when the matter is again before the U.S. Court of Military Appeals.

First, let me say that I am in complete agreement with all the findings reached by the Court except numbers 16 and 19, and number 26 insofar as it assumes the existence of unlawful command influence, but the significance of two of those findings is open to interpretation.

Number 13: Anyone who has served in a supervisory position and has witnessed performance by a subordinate considered less than fully satisfactory understands that there is sometimes a reluctance to confront the subordinate with the deficiency immediately. In part this may be due to a desire to avoid an unpleasant or disruptive situation, or to a hope that the deficiency will remedy itself, or to a decision simply to tolerate it if it is not causing major problems, especially if it exists in a sensitive area. Once the deficiency does begin to cause problems, however, the supervisor may decide that remedial action is necessary. In concurring in the Court's finding number 13, I reject any implication, if there is one, that Chief Judge Garvin was merely acting as a conduit for the views of Commander, U.S. Naval Activities, United Kingdom (COMNAVACTSUK), or the endorser, Commander in Chief, U.S. Naval Forces, Europe (CINCUSNAVEUR). On the contrary, as I view it, the COMNAVACTSUK letter, with CINCUSNAVEUR endorsement, was for Chief Judge Garvin the last straw, so to speak, which not only confirmed his own judgment, derived from his review of case reports and other infor-

mation reaching him from time to time, as to the existence of a deficiency, but also convinced him that it was now causing real problems, and that his supervisory responsibilities no longer allowed him to tolerate it in silence.

Number 14: The standard instruction delivered to members before sending them out to deliberate on a sentence directs them to consider "the ends of good order and discipline in the service, the needs of this accused, and the welfare of society," or words to that effect. There can be no doubt that one of the purposes of military law is "to assist in maintaining good order and discipline in the armed forces," Part I, *Preamble*, Manual for Courts–Martial, United States, 1984. That is only one of the functions of a proper court-martial sentence; hence, a severe sentence may better assist in maintaining good order and discipline than a lenient sentence, yet not be a proper sentence, because it neglects other interests to be promoted by sentencing. Conversely, an excessively lenient sentence may neglect good order and discipline and thereby be an improper sentence. If a memorandum is written to a military judge who regularly adjudges excessively lenient sentences informing him that his excessively lenient sentences are failing to perform one of the recognized functions of sentencing, a *mediate* purpose of the memorandum can be said to be to encourage the judge to increase the severity of his sentences; the *ultimate* purpose, however, is to achieve a balancing of interests that will produce proper sentences. In concurring in the Court's finding of fact number 14, I do so with the understanding that Chief Judge Garvin's ultimate purpose was to encourage the judges of the Transatlantic Judicial Circuit to adjudge properly balanced sentences, which, in Chief Judge Garvin's view, was not happening and could be achieved only by their increasing the severity of their sentences, not necessarily in any particular cases, but on average.

This Court's conclusion that the judges of the Transatlantic Judicial Circuit were subjected to unlawful command influence is evidently based on that portion of Article 37(a) which reads:

No person subject to this chapter may ..., by any unauthorized means, influence the actions of a court-martial ... or any member thereof, in reaching the findings or sentence in any case....

Presumably, the words "No person subject to this chapter" mean exactly what they say, but the phrases "by any unauthorized means" and "in any case" have been the subjects of some interpretation.

No one in the armed forces is so independent as to be free of accountability to military authority. For judge advocates, including military judges, the most exquisite degree of independence bestowed by the Congress comes from being directly accountable to the Judge Advocate General or his designee, and such assignment is generally viewed as the ultimate protection against command influence. In the Senate Report No. 1601, 90th Cong., 2d Sess. (1968), U.S.Code Cong. & Admin.News 1968, 4501, accompanying the Military Justice Act of 1968, P.L. 90–632, the following explanation is provided for the proposed amendment to Article 26:

The intent is to provide for the establishment within each service of an independent judiciary composed of military judges certified for duty on general courts-martial, who are assigned directly to the Judge Advocate General of the service and are responsible only to him or his designees for *direction and fitness ratings*. [Emphasis supplied.] [1968] U.S.Code Cong. and Ad.News 4507–08.

Interpreting the foregoing language as it appears in Article 26, the U.S. Court of Military Appeals in *United States v. Moorehead*, 20 U.S.C.M.A. 574, 44 C.M.R. 4 (1971), wrote:

We infer that the "assigned and directly responsible to" language was intended to subject officers functioning as military judges of general courts-martial to the control of legal officers instead of line commanders.

Similarly, when the Secretary of Defense sought to assure the independence of de-

fense counsel, he issued the so-called Laird Memorandum, dated 11 January 1973, which stated in part:

> The Military Departments are directed to submit plans to revise the structure of the Judge Advocate organizations to place defense counsel under the authority of the Judge Advocate General, and in the case of the Marine Corps, under the Director, Judge Advocate Division.

Direct accountability to the Judge Advocate General is deemed the cornerstone of judicial independence in the armed forces, and, under Article 66, it applies to this Court, as well. Thus, notwithstanding its reference to an independent judicial commission in *Ledbetter*, the U.S. Court of Military Appeals was quite content, apart from its judicial responsibilities in deciding the case before it, to allow the Judge Advocate General of the Navy to police his own Court of Military Review, *provided that he intended to do so*, with respect to misconduct alleged in connection with the proceedings in the latter Court. *See United States v. Rojas*, 17 M.J. 154 (C.M.A.1984). *Per contra*, in *United States Navy–Marine Corps Court of Military Review v. Carlucci*, 26 M.J. 328 (C.M.A.1988), in appointing Judge Cox as its own Special Master, the U.S. Court of Military Appeals inserted the pointed footnote 14:

> So far as we are informed, the Judge Advocate General of the Navy has not initiated any investigation of the allegations of judicial misconduct; and it has not been suggested that he intends or has been requested to do so. If such an investigation had been undertaken, a different remedy might have been feasible. *Cf.* R.C.M. 109(a), Manual for Courts–Martial, United States, 1984.

The foregoing citations leave no room for doubt that, although the U.S. Court of Military Appeals may possess certain inherent residual powers with respect to the military justice system ancillary to its explicit statutory jurisdiction, the Judge Advocate General and his designees have the power of "direction and fitness ratings" (Article 26) and "control" (*Moorehead*) over members of the Trial Judiciary, subject, of course, to Article 37(a).

Considering the Judge Advocate General's responsibilities under Articles 6 and 26 and the Chief Judge's responsibilities as the JAG designee, I am convinced that the concern expressed by Chief Judge Garvin for "the perception of the judge's role in military justice, in general, and more specifically the perceptions dominant in the community concerning the judiciary" was a legitimate concern. Moreover, if there, indeed, was "a growing perception ... that the judiciary may be leaning toward a definite defense orientation vice a fair and impartial tribunal which takes into account the needs of all parties in interest," I am, likewise, convinced that the Judge Advocate General had a responsibility, exercisable through the Chief Judge as his designee, to determine the cause of such perception and to correct the perception, if the perception was erroneous, or to fix what was causing it, if the perception was correct.

Whether the Chief Judge is redesignated for this purpose a one-person "independent judicial commission" or remains the JAG designee under Article 26 is not, for me at least, particularly significant. Presumably, "independent" in this context means independent of the line, not independent of the Judge Advocate General, since even an independent judicial commission would have no independent authority of its own but would report to the Judge Advocate General, who has the authority to approve or disapprove its findings and implement or not implement its recommendations as he thinks best. If this is so, then, pursuant to the rationale of *Moorehead*, the JAG designee under Article 26 would have all the independence he needs. The practical difference would be that, if acting as the JAG designee, the Chief Judge would not be limited to reporting to the Judge Advocate General but would also have the power to take whatever remedial measures were within the proper scope of his designation.

It is a fact of bureaucratic life that, if the causes of a military justice problem are sought from everywhere but the judiciary,

the problem, if there is one, will usually end up being attributed to the judiciary's fault, whether or not it is so in actuality. Consequently, if I were the trial judge concerned, I should much prefer having the Chief Judge seek an explanation from me directly, with which to defend the judiciary's position, to having him get his information from third parties whose interests might be served by blaming the judiciary for their own delicts. Had the callers to Judge Paul in *Ledbetter* merely asked for information about the trial instead of accusatorily demanding the judge's rationale and suggesting that he must have done something wrong to have aroused the convening authority's displeasure, Judge Paul's reaction might have been quite different. How such an informal inquiry would square with the ABA Standards is debatable, but I should think that the last thing a military judge would want, even if the Department of Defense were disposed to fund such an evolution, would be to be descended upon by an independent judicial commission composed of lay citizens, lawyers, and judges every time a question arose about one of his cases. There is, in my view, a world of difference between an allegation of misconduct or incompetence, on the one hand, and a question regarding performance, on the other. An independent judicial commission may or may not be the necessary and appropriate entity to investigate the former, but it seems to me that normal supervisory channels should be allowed to deal with the latter in a routine fashion pursuant to the "direction and fitness ratings" authority of Article 26. If not, what did the Congress intend such authority to be for?

If any adverse actions are taken against, or critical communications made to, a judge by the Judge Advocate General or his designee solely or even principally on the basis of complaints from or perceptions of convening authorities or other commanders, or their staffs for them, the conduit situation condemned in *Ledbetter* would apparently exist. This does not, and in my view should not, mean that a conduit situation necessarily arises whenever the complaint of a convening authority serves to prompt or in some way to figure in a non-accusatorial, performance-related inquiry by the Judge Advocate General or his designee. Obviously, if one of the questions is whether or not a certain perception exists, a complaint may be circumstantial evidence of such perception, although by itself it proves nothing about the validity of either the complaint or the perception. As I interpret the evidence in this case, Chief Judge Garvin examined case reports as they were received and, over time, formed cumulative impressions of the various judges on the basis of those reports. Those impressions may not have been verified with arithmetical precision, nor were records of trial examined to ensure rigorous validity in all comparisons; and the impressions may have been confirmed by various communications of dissatisfaction with the performance of the Transatlantic Judicial Circuit, including the COMNAVACTSUK letter. Even so, while the lack of precision and rigor may be deemed to have affected the quality of the Chief Judge's evaluative process, I fail to see how either the lack of precision and rigor, or the confirmation of impressions by outside complaints, transformed the essential nature of the process from an independent evaluation to a conduit for command influence.

As noted above, Article 26 makes all military judges responsible to the Judge Advocate General or his designee for "direction and fitness ratings." In this respect, a comparison with Article 37(b) is interesting. Article 37(b) provides:

> In the preparation of an effectiveness, fitness, or efficiency report or any other report or document used in whole or in part for the purpose of determining whether a member of the armed forces is qualified to be advanced in grade, or in determining the assignment or transfer of a member of the armed forces or in determining whether a member of the armed forces should be retained on active duty, no person subject to this chapter may, in preparing any such report (1) consider or evaluate the performance of duty of any such person as a member of a court-martial, or (2) give a less favor-

able rating or evaluation of any member of the armed forces because of the zeal with which such member, as counsel, represented any accused before a court-martial.

Subsection (b) of Article 37 was added by the same Military Justice Act of 1968 that created the "independent field judiciary" for general courts-martial and the not-so-independent military judges for special courts-martial. Conspicuously absent from among those afforded fitness report protection by Article 37(b) are the military judges of either general or special courts-martial. Since it would be absurd to exempt military judges from being evaluated on their performance of their primary duty, the Congress provided an alternate form of protection: that only the Judge Advocate General or his designee would be the one to provide them "direction and fitness ratings."

Although a discussion of fitness reports may seem tangential to this case, I regard it as central to an adequate treatment of the issue for two reasons.

First, a fitness report (except one given upon detachment) operates both retrospectively and prospectively. Insofar as the ratee is concerned about improving his rating, he will take any express or implied criticism in the report as an indication of changes to be made. Consequently, if Chief Judge Garvin had simply waited a few weeks, he might have issued a fitness report to Circuit Judge Henderson which contained grades of "B" or "C" in "Judgment" and "Navy Organizational Support," backed by a narrative stating that Judge Henderson's sentences across the board were so consistently below Trial Judiciary norms as to have created in his Circuit the growing perception that the judiciary may be leaning toward a definite defense orientation vice a fair and impartial tribunal, etc. Given the knowledgeability of experienced judges on the subject of sentencing, as described in *United States v. Ballard*, 20 M.J. 282 (C.M.A.1985), and the explicit authority over fitness ratings conferred by Article 26, I suggest that such a fitness report, unless the statements therein could be objectively refuted, would be immune from attack under Article 37, *cf. United States v. Pack*, 9 M.J. 752 (NCMR 1980), or otherwise. To condemn a memorandum as command influence, while sanctioning a fitness report to and with the same effect, would merely elevate form over substance and would, thus, contribute little or nothing to judicial independence.

Second, it is firmly established by military custom and tradition that it would be inexcusable behavior on the part of a reporting senior to fail to counsel a ratee on deficiencies of which the reporting senior was well aware before issuing a derogatory fitness report. Thus, Article 26 mentions responsibility not only for fitness ratings but also for "direction." Obviously, Article 37 must be deemed to place limitations on the "direction" that can be given, lest each trial judge become nothing more than an extension of the Judge Advocate General or his designee; at the same time, however, in light of the statutory scheme enacted by the Congress and past interpretations of Article 37 by the courts, I simply cannot find any legal basis for holding that a memorandum from the JAG designee informing a judge of the *facts* that his sentences are consistently below Trial Judiciary norms, that complaints have been received, and that the perception of a pro-defense orientation has arisen in his judicial circuit, combined with a *request* to reexamine his sentencing philosophy, constitutes an "unauthorized means."

In addition to the requirement of Article 37 that the attempt to influence be "by any unauthorized means," there is the requirement that the attempt be to influence the findings or sentence "in any case." Several decisions relating to instructional lectures to members have given meaning to this language.

In *United States v. Danzine*, 12 U.S.C. M.A. 350, 30 C.M.R. 350 (1961), the court wrote as follows:

Having concluded the lectures did not inject improper command influence into the picture, we could end our discussion here. But in view of the defense complaints about the timing of the remarks, we deem it appropriate to say a word

about that subject. The lectures were not singularly significant as to accused's case, and were given a full month before he was tried. Indeed, neither the instant proceeding nor any other had even been referred to trial when the remarks were disseminated to the newly appointed court-martial. As a matter of fact, at the time of the lectures, there was no way for anyone to know just when accused might be tried.

In *United States v. Isbell,* 3 U.S.C.M.A. 782, 14 C.M.R. 200 (1954), the court had before it a claim that the court which tried the accused had been exposed to a communication from higher authority entitled "Retention of Thieves in the Army" which denounced the results of recent general court-martial cases in which, although the accused were "properly" convicted of stealing substantial sums of money, they were given sentences which "improperly" retained them in the Army. The communication went on to say that court-martial members should be very carefully chosen, and that, when the individual members had verified by their performance that they had the necessary qualities, that fact should be recognized in their efficiency reports. In distinguishing *United States v. Littrice,* 3 U.S.C.M.A. 487, 13 C.M.R. 43 (1953), in which reading of the identical communication had led to reversal, the court in *Isbell* wrote:

> In the Littrice case, supra, the convening authority appeared before a court-martial convened for the trial of an accused charged with larceny. Immediately before trial began, he read them several instructions, including the letter designated in this case as Defense Exhibit B. As an abstract proposition, and when used solely as a precept to subordinate commanders, the letter was not objectionable, but we condemned its use in that case. There we held that *when read to the members of a court-martial immediately before trial,* and in connection with instructions upon retaining thieves in the Army, the reference to efficiency reports amounted to a veiled threat.

The circumstances of the instant case are entirely different. Here the letter was disseminated to the command as a part of a general program of indoctrination and instruction. When this document was distributed, the offenses of which the accused was convicted had not been committed, nor had the court-martial before which he was tried been appointed.

Similarly, in *United States v. Ferguson,* 5 U.S.C.M.A. 68, 17 C.M.R. 68 (1954) it was mentioned as being significant to a finding of unlawful command influence that the accused's trial took place on the day immediately following the offending communication to a group including the members. *See also United States v. Wright,* 17 U.S.C.M.A. 110, 37 C.M.R. 374 (1967).

On the basis of the analysis set forth above, such as it is, I conclude that Chief Judge Garvin did not violate Article 37, both because his memorandum was not an "unauthorized means," and because it was not an attempt to influence the findings or sentence "in any case."

This is not to say that one could not parse the memorandum and find matters that were better left out. Probably, the reference to the tempo of activity in the Mediterranean as an aggravating circumstance should not be considered except where specific evidence of it has been properly admitted, perhaps as victim impact evidence, in a particular case. *Cf. Ferguson; see also United States v. Mamaluy,* 10 U.S.C.M.A. 102, 27 C.M.R. 176 (1959). Similarly, the number of discharges adjudged in a month and generalizations about sentences in particular cases prove little, if anything, and can be misleading. Finally, any suggestion of a relationship, from a judicial standpoint, between the cost of a trial and the severity of the sentence obviously cannot be taken literally. I do not believe, however, that the memorandum was intended to be, nor that it should be, read in such a minute manner. Clearly, the Chief Judge sought to avoid the appearance of a formal censure by omitting the kind of detail that would normally be found in a formal censure. Unfortunately, the

majority have implicitly concluded from the lack of detail in the memorandum, in conjunction with the Chief Judge's puzzling responses regarding the *Derring* case report and the COMNAVACTSUK letter, that the "Henderson memorandum" was a mere conduit for the displeasure of COMNAVACTSUK and CINCUSNAVEUR. With that implicit conclusion I cannot agree.

The U.S. Court of Military Appeals has made repeated references to what it calls "the necessity of maintaining a delicate balance between justice and discipline" (*Littrice*) which has confronted the Congress over the years. *See also United States v. Davis*, 12 U.S.C.M.A. 576, 31 C.M.R. 162 (1961). The establishment of a military trial judiciary was a significant step in reducing the opportunity for command influence, *United States v. Butler*, 14 M.J. 72 (C.M.A.1982), and, as succinctly stated in *Ledbetter*, "Article 26(c)'s provision for an independent trial judiciary responsible only to the Judge Advocate General certainly was not designed merely to structure a more complicated conduit for command influence."

The Congress, nevertheless, apparently has also recognized the extraordinary influence that a military judge may exert over discipline throughout an extensive area. Especially overseas, a single military judge may cover a circuit encompassing millions of square kilometers and thousands of military personnel. If, for example, that individual judge was unwilling to accept the accuracy of urinalysis, regardless of the evidence, he could singlehandedly eviscerate the armed forces' entire multimillion-dollar drug-suppression program within his circuit and thereby contribute to the proliferation of drug abuse in scores of activities. Similarly, if that judge sincerely believed that, in all but the most egregious cases, punishment beyond the level of Article 15 was unwarranted, he could virtually nullify the court-martial process as a means of maintaining good order and discipline in his circuit. Obviously, such judicial performance could not long be tolerated.

Consequently, in an effort to maintain the "delicate balance," the Congress has placed the military judiciaries under the supervision and control of the respective Judge Advocates General, senior military officers with many responsibilities akin to those of attorneys-general and complex and subtle relationships to the line components of their services. *See, e.g., United States v. Grow*, 3 U.S.C.M.A. 77, 11 C.M.R. 77 (1953) (Part II); *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967) (Part II). *See also* Chief of Naval Operations Instruction 5430.48C, dated 2 September 1988, *re* Special Assistant for Legal Services OP–09J. In addition, in the more than thirteen years since the suggestion in *Ledbetter* of tenure for judges in the military judiciaries, the position of the judges *vis-a-vis* tenure remains unchanged. Consequently, as was conceded at oral argument, a Judge Advocate General may legally relieve a military judge with whose sentences he is displeased altogether, both to eliminate the offending individual from the judiciary and, as has been said, *pour encourager les autres*. (On the present record, it would be impermissible to cite a specific instance, but suffice it to say that it would also be a mistake to assume that such a thing has never happened.) And members of the military judiciaries receive their fitness reports on the same forms, and are marked in the same applicable categories, as other military officers.

In *United States v. Navarre*, 5 U.S.C. M.A. 32, 17 C.M.R. 32 (1954) the commanding officer of the members, a colonel, had held a "court-martial school" for prospective members, in which he related an anecdote about a lieutenant colonel who had received a low efficiency report for failing as a member of a court-martial to exercise the good judgment expected of an officer of the Army. After noting that each member of the court-martial had responded on *voir dire* that he would not be influenced by the Colonel's anecdote, Judge Brosman, in dissent, summarized the evils of any reference to efficiency reports as follows:

The difficulty with this is, however, that the Colonel's not unpurposeful anecdote may well have served to start the

minds of court members running in a reprehended channel—that is, they may have begun to think of their commanding officer's views and the results *he* desired. Also they could well have thought of their personal fates as being bound up in some measure with the outcome of specific litigation.

With this in mind, it is interesting to contemplate the U.S. Navy–Marine Corps Trial Judiciary in the post-*Mabe* environment. As a result of the U.S. Court of Military Appeals' remand and this Court's majority opinion, virtually all members of the U.S. Navy–Marine Corps Trial Judiciary will have read not only the "Henderson memorandum" but also the Chief Judge's 6 July 1988 and 1 August 1988 memoranda and, through them, will be well-acquainted with their Chief Judge's views on sentencing. Although certain prophylactic pronouncements were made in the aftermath of Circuit Judge Henderson's disclosure to preserve cases in the event that the memorandum was ultimately ruled to constitute command influence, the actions taken included soliciting Chief Judge Garvin's input for Circuit Judge Henderson's fitness report and extending Chief Judge Garvin for an additional year in his present position. Moreover, whereas, in the past, nearly all circuit judges had already attained the grade of 0–6, many now are, or shortly will be, 0–5's competitive for 0–6 in a highly selective environment, who understand perfectly that, with respect to their own fitness reports, the least adjustment in the rankings or slightest nuance in a narrative could make the difference between selection and passover.

Obviously, some tension is going to exist between judicial independence and the fitness report system, which requires a single individual to evaluate trial judges on their judgment, imagination, analytical ability, and Navy organizational support. Whether the reporting senior is a line officer or a legal officer, I am certainly not unmindful of the human tendency to rate the performance of others on the basis of how closely what the ratees did matched what the reporting senior would have done in like circumstances, nor am I insensitive to the danger that such a rating system poses to judicial independence. There is, however, no indication that Chief Judge Garvin has employed, or intends to employ, any such system, and, in placing military judges under the Judge Advocate General or his designee for fitness ratings, the Congress must have expected that judge advocates, in particular, would understand the inappropriateness of such a standard as applied to the judiciary.

At the same time, where a judge's decisions fall outside what the reporting senior considers a reasonable range, the reporting senior's obligation to evaluate the ratee's "judgment" and "analytical ability" implies, to me at least, that the reporting senior is supposed to have sufficient access to the ratee to enable him to examine the ratee's decision-making processes. Moreover, it is in the ratee's career interest to maintain the kind of relationship with his reporting senior in which a non-accusatorial inquiry into the basis of a decision would be deemed, not an investigation of suspected misconduct or incompetence nor a threat to judicial independence, but an honorable means whereby the reporting senior can obtain the information he requires to perform his rating and other supervisory duties properly, and whereby the ratee is afforded input into his own evaluation. For precisely this reason, when I was a Circuit Judge, I would frequently and of my own volition annotate my case reports with a brief explanation of any unusual circumstances or evidence so as to anticipate any legitimate questions that might arise in the mind of the Chief Judge. I am greatly concerned that the majority's remedy, based on their reading of *Ledbetter*, albeit supremely well-intentioned, would so stanch the dialogue between the Chief Judge and his far-flung Circuit Judges as to render a meaningful and accurate evaluation of their judicial performance impracticable. If that ever happened, the continuing bureaucratic requirement for fitness reports would necessitate the development of a radically different rating system based, not on the quality of judicial deci-

**1276**

sion-making, but on whatever marginally significant objective criteria might be readily compatible with data retrievable from a computerized "management information system," such as the number of discharges and months of confinement awarded during the reporting period, or the current favorite for non-judiciary activities: processing times. Moreover, unsubstantiated criticisms from the judges' detractors, such as the "grumblings from the Med," would continue to reach and possibly prejudice the reporting senior, while the targets of the criticisms would be cut off from any opportunity to defend themselves, unless such criticisms rose to the level of official complaints of misconduct or incompetence, which they rarely, if ever, would. Any such developments would have severe implications for the continued ability of the trial judiciary to attract the best and the brightest and, in my opinion, would be inconsistent with the Congressional design.

From the language of Article 26, it is apparent that the Congress well understood the interrelationship between "direction" and "fitness ratings," and that it contemplated a judicial performance evaluation system such as that presently in use. The majority's opinion addresses "direction" alone. While, in many situations, a partial solution is better than no solution at all, in the area of judicial independence, the status quo is, in my opinion, preferable to the incompatibilities, not to mention the complacency, that would result from a less than comprehensive restructuring.

Because I have concluded that there was no unlawful command influence in this case, and that, even if there was, it in no way prejudiced this appellant, I join the majority in voting to affirm.

STRICKLAND, Judge (concurring in the result):

I concur in Judge Freyer's opinion.