UNITED STATES, Appellee,

v.

James D. MABE, Machinist's Mate
First Class, U.S. Navy, Appellant.

No. 62,597.

NMCM 88 4053R.

U.S. Court of Military Appeals.

Argued Jan. 10, 1991.

Decided Sept. 18, 1991.

For Appellant: *Lieutenant Mary Anne Razim*, JAGC, USNR (argued).

For Appellee: *Lieutenant Commander Lawrence W. Muschamp*, JAGC, USN (argued); *Commander Thomas W. Osborne*, JAGC, USN (on brief).

---

### Opinion of the Court

SULLIVAN, Chief Judge:

Appellant was tried by a military judge sitting alone at a special court-martial on August 9, 1988. This court-martial was held on board the USS FORRESTAL (CV-59) in the Mediterranean Sea, and the military judge was Judge Richard C. Noren,[1] a Naval Reserve Captain. Appellant, pursuant to his pleas, was found guilty of an unauthorized absence (UA) of approximately 2 months and missing movement by design, in violation of Articles 86 and 87, Uniform Code of Military Justice, 10 USC §§ 886 and 887, respectively. He was sentenced to a bad-conduct discharge, confinement for 3 months, and reduction to pay grade E-3. The convening authority approved the sentence as adjudged, but he suspended confinement in excess of 30 days under the terms of a pretrial agreement.

The Court of Military Review initially affirmed the approved findings of guilty and sentence in a short-form opinion on February 15, 1989. Appellant petitioned this Court for review, but we remanded this case to the Court of Military Review for further proceedings. 28 MJ 326 (1989). The Court of Military Review rendered a second decision in this case, *en banc*, affirming the findings of guilty and sentence on May 14, 1990. 30 MJ 1254. Two judges

---

1. Judge Noren died on February 5, 1989.

---

concurred in the result only and issued a lengthy separate opinion.

Additional briefs were ordered by this Court on May 20, 1990. Review was then granted on the following issue raised by appellant:

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED IN FAILING TO FASHION A REMEDY AFTER FINDING THAT APPELLANT'S COURT-MARTIAL WAS TAINTED BY UNLAWFUL COMMAND INFLUENCE.

We hold that the court below committed no error in failing to order remedial action in this case and affirm. *United States v. Sullivan*, 26 MJ 442, 444 (CMA 1988); *see generally United States v. Thomas*, 22 MJ 388 (CMA 1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).

The facts giving rise to the granted issue are fully recounted in the *en banc* opinion of the Court of Military Review. 30 MJ at 1256–65. The controversy in this case stems from a handwritten letter dated June 22, 1988, from Captain Ron Garvin, Chief Judge, Navy–Marine Corps Trial Judiciary, to Captain W.C. Henderson, Chief Judge, Transatlantic Judicial Circuit. It states:

OFFICE OF THE CHIEF JUDGE

NAVY–MARINE CORPS
TRIAL JUDICIARY

BLDG. 200–4, WASHINGTON
NAVY YARD

WASHINGTON, D.C. 20374–2004

Date: 22 Jun 88

MEMORANDUM

To: Capt Henderson

Bill,

I have a great reluctance to write this note to you, but I know you are true Navy through & through and that you would want someone to share pertinent information with you. *The subject is sentencing.* As you should be aware I examine every court-martial case report

submitted from the field. In many instances I am surprised and sometimes shocked by judge alone sentences *but I seldom say anything about the sentence as I do not want to chill the independence of field judges.*

*However, I must share with you that your circuit—across the board—is the forum of choice for an accused.* You advise me that ships' operations in the Med are ongoing at such a pace that we must respond to trial requests immediately since movements and future port calls are unpredictable. In that tempo of activity, I should believe that UA is a *serious* [emphasis in original] offense— much more so than in other areas of the world. However, in May no Transatlantic UA offender earned a BCD; several offenders received no reduction in rate and petty officers, in some instances, were still petty officers after their convictions.

Bill, I know you must wonder what is going on at my office—and you must be asking *why I'm targeting your circuit for improvement.* Believe me—my concern is strictly professional. First, yours is by far the largest travel budget in the judiciary; therefore, it is a prime target for saving by achieving greater efficiency. *Second, I am receiving grumblings from the Med regarding sentences. When that happens across the board, e.g. not a comment regarding an unusual case, we must ask ourselves whether the judiciary is in fact administering justice in support of overall good order and discipline?*

My concern, of course, is the perception of the judge's role in military justice, in general, and more specifically the perceptions dominant in the community concerning the judiciary as a whole-and the circuit as a piece of that whole.

What you do, of course, is a matter completely within your discretion and control *but I'd be remiss if I did not advise you that the growing perception is that the judiciary may be leaning toward a definite defense orientation vice a fair and impartial tribunal which takes into account the needs of all parties in interest, including the government and the victim* (when there is one). I know you and your troops are dedicated to doing the job right & I want to help & to support you to the fullest, *that's why I elected to communicate by this informal note vice "officially."*

There are times when each of us needs someone to say something that causes us to reevaluate what we are doing. That's my purpose today. *I want to advise that there is dissatisfaction & criticism* (and it is not Ed!) *and permit you to do your own reevaluation of the situation.* I know it is a tough job to fairly balance the interests of everyone involved in military justice but that's what judges are supposed to do. *When we tilt to [sic] far in any direction, someone inevitably calls it to our attention & we reexamine.* That's it in a nutshell.

Keep pitchin' friend. It's a tough job—I do realize that. My purpose is to ensure we all improve and do it better— not necessarily easier—just better.

Regards,

Ron

P.S. I've attached a recent E–Mail to give you the flavor of budgeting here in WASH!!!

(Emphasis added; attachment omitted.)

A six-judge majority of the Court of Military Review, over vociferous objections from a two-judge minority, held (30 MJ at 1266–67) that this letter constituted unlawful command influence, in violation of Article 37, UCMJ, 10 USC § 837.[2] Neverthe-

---

**2.** Article 37, which is styled, "Unlawfully influencing action of court," states:

    (a) No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with re-

spect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding. *No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or*

less, it affirmed the findings of guilty and the sentence because of subsequent actions taken by the Judge Advocate General of the Navy, Circuit Judge Henderson, and Trial Judge Noren. 30 MJ at 1267.

---

Our starting point in this case is the granted issue. It asserts that the majority of the Court of Military Review found "that appellant's court-martial was tainted by unlawful command influence." It then asks whether the court below erred in not ordering some type of remedy or relief as a result of that unlawful action. This phrasing of the granted issue is somewhat misleading.

Admittedly, a majority of the Court of Military Review specifically found that "unlawful command influence has been exercised in Mabe's case." Nevertheless, it also held that it was "convinced beyond a reasonable doubt that the findings and sentence in appellant's case were unaffected by the unlawful command influence." 30 MJ at 1267. In our view, this constitutes a holding by the court below that appellant's court-martial was not tainted by command influence or that any taint was overcome. *See United States v. Sullivan, supra* at 444. Accordingly, it is that particular conclusion of an absence of prejudice which we will review today. *See generally United States v. Thomas, supra* at 394.

█ We also note that the granted issue presumes a majority of the Court of Military Review was correct in holding that command influence was exercised in this case. The Government does not actively dispute this point, but it does call our attention to the opinion of two appellate military judges concurring in the result. It then proceeds to argue that, even if command influence was exercised in this case, the court below was correct in finding that such illegality was harmless. *See United States v. Thomas, supra.* We agree with the conclusion of the majority below that command influence existed in this case. *See* Art. 37(a). Nonetheless, some preliminary comments on objections raised in the opinion concurring in the result are warranted.

The judges concurring in the result at the Court of Military Review opined that Chief Judge Garvin's letter was not unlawful command influence but rather a legitimate exercise of his military supervisory authority. In particular, they assert that his Memorandum was the functional equivalent of a fitness report and that its comments on sentencing were appropriate matters in the routine judicial evaluation of a military judge. Moreover, they found that his reference to "grumblings in the Med" was a legitimate consideration for the designee of the Judge Advocate General of the Navy in forming his assessment of a military judge's "Judgment" and "Navy Organizational Support." 30 MJ at 1272. Judicial independence, they contend, means independence from command, not the Judge Advocate General or his designee, *i.e.*, the Chief of the Navy–Marine Corps Trial Judiciary. *Id.* at 1270.

*any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.* The foregoing provisions of the subsection shall not apply with respect to (1) general instructional or informational courses in military justice if such courses are designed solely for the purpose of instructing members of a command in the substantive and procedural aspects of courts-martial, or (2) to statements and instructions given in open court by the military judge, president of a special court-martial, or counsel.

(b) In the preparation of an effectiveness, fitness, or efficiency report, or any other report or document used in whole or in part for the purpose of determining whether a member of the armed force is qualified to be advanced, in grade, or in determining the assignment or transfer of a member of the armed forces or in determining whether a member of the armed forces should be retained on active duty, no person subject to this chapter may, in preparing any such report (1) consider or evaluate the performance of duty of any such member as a member of a court-martial, or (2) give a less favorable rating or evaluation of any member of the armed forces because of the zeal with which such member, as counsel, represented any accused before a court-martial. (Emphasis added.)

■ The bottom line of their opinion is that the sentencing process at judge-alone courts-martial not only can but must be controlled by the Judge Advocate General or his designee, *i.e.,* the Chief Judge of the Trial Judiciary. This assertion rests on the language of Article 26(c), UCMJ, 10 USC § 826(c)[3]; the decision of this Court in *United States v. Moorehead,* 20 USCMA 574, 578, 44 CMR 4, 8 (1971); and service regulations concerning officer fitness reports in the Navy-*see generally* NAVMIL-

PERSCOM INST 1611.1 (12 May 1981). 30 MJ at 1269–70, 1272. The method of control or direction preferred in the opinion concurring in the result is the fitness-report system for the officer-judges,[4] although formalism is not required and more informal vehicles such as the letter-memorandum at issue in this case will suffice. Even if this method of control is unauthorized, the two judges in the minority assert that the lack of specificity in the memorandum with respect to appellant's case pre-

---

**3.** Article 26 states:

(c) The military judge of a general court-martial shall be designated by the Judge Advocate General, or his designee, of the armed force of which the military judge is a member for detail in accordance with regulations prescribed under subsection (a). Unless the court-martial was convened by the President or the Secretary concerned, neither the convening authority nor any member of his staff shall prepare or review any report concerning the effectiveness, fitness, or efficiency of the military judge so detailed, which relates to his performance of duty as a military judge. *A commissioned officer who is certified to be qualified for duty as a military judge of a general court-martial may perform such duties only when he is assigned and directly responsible to the Judge Advocate General, or his designee, of the armed force of which the military judge is a member* and may perform duties of a judicial or nonjudicial nature other than those relating to his primary duty as a military judge of a general court-martial when such duties are assigned to him by or with the approval of that Judge Advocate General or his designee.

(Emphasis added.)

The judges concurring in the result below also referenced the legislative history of this provision, which states:

Proposed new subsection (c) will enact into law the general principles of the "independent field judiciary" system already adopted administratively by some of the armed services, while leaving to the services a desirable degree of flexibility for implementing improvements in detail which may be indicated by additional experience. The intent is to provide for the establishment within each service of an independent judiciary composed of military judges certified for duty on general courts-martial, who are assigned directly to the Judge Advocate General of the service and are *responsible only to him or his designees for direction and fitness ratings.* Rules for designating and detailing military judges of special courts-martial are left subject to regulations of the Secretary concerned. This will permit the establishment of special lists of junior

judge advocates who can be utilized for other duties while serving as military judges of special courts-martial in preparation for later assignment to general courts-martial.

S.Rep. No. 1601, 90th Cong., 2d Sess. 7 (1968), reprinted in 1968 U.S.Code Cong. & Admin.News 4507–08 (emphasis added). 30 MJ 1254, 1269 (1990).

**4.** NAVMARTRIJUDIC INSTRUCTION 1611.1 (12 Aug 1985) provides:

3. *Action*

a. *Active Duty Navy Military Judges' Fitness Reports*

(1) Circuit military judges' fitness reports. Fitness reports for all Navy circuit military judges shall be signed by the Chief Judge. The Deputy Judge Advocate General will endorse all captains' fitness reports that are signed by the Chief Judge.

(2) Navy military judges that are *not* circuit military judges. Fitness reports for all Navy military judges that are *not* circuit military judges normally shall be signed by the cognizant circuit military judge. If the military judge to be reported upon is:

(a) A captain (0–6) or

(b) Senior in grade or

(c) Senior in date of rank

to the circuit military judge, the fitness report shall be signed by the Chief Judge, and if the military judge is an 0–6, that fitness report shall be endorsed by the Deputy Judge Advocate General.

\* \* \*

c. *Reserves*

\* \* \*

(2) Navy. Fitness reports for all Naval Reserve military judges while on active duty for training shall be signed by the circuit military judge of the circuit to which the judge is assigned. If a Reserve military judge is senior *in grade* to the circuit military judge, the Chief Judge will sign the fitness report. If the Reserve military judge and the circuit military judge are in the *same* grade, regardless of date of rank, the fitness report shall be signed by the circuit military judge.

cludes a conclusion that Article 37(a) was violated.

We unequivocally reject this admittedly "personal" view of the military justice system and its concomitant undermining of the independence of the military judge. It improperly reduces the court-martial judge, already without tenure, to the status of a mere alter-ego of the Judge Advocate General or his designee. *See United States v. Ledbetter*, 2 MJ 37, 42 (CMA 1976). Moreover, it impermissibly authorizes judge advocate command coercion of the military judge's decisions on findings as well as on sentence. Art. 37(a). This coercion results from the well-recognized effect of fitness-report evaluations on a military lawyer's service advancement and security. *See generally Sanders v. United States*, 594 F.2d 804, 814, 219 Ct.Cl. 285 (1979); *see, e.g., Muse v. United States*, 21 Cl.Ct. 592, 603 (1990). *See* Wiener, *The Army's Field Judiciary System: A Notable Advance*, 46 A.B.A.J. 1178, 1180 (Nov.1960); Fidell, *Military Judges and Military Justice: The Path to Judicial Independence*, 37 Fed. Bar News and Journal 346, 351 (1990). Finally, it permits *de facto* disciplinary sanction of a judge for mere error or decisional unpopularity, a practice not otherwise accepted in American jurisprudence. *See* J. Shaman, S. Lubet, and J. Alfini, *Judicial Conduct and Ethics* 5–8, 22–27, 93–96 (1990). We have examined the legislative history of the 1968 amendments to the Uniform Code and are convinced that Congress did not create or intend to create such a judicial sham. *See* S.Rep. No. 1601, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.Code Cong. & Admin.News 4501. *See generally United States Navy–Marine Corps Court of Military Review v. Carlucci*, 26 MJ 328, 336 (CMA 1988).

The minority's view of the military judge's status in the military justice system also conflicts with other sections of the Uniform Code of Military Justice and our case law applying the same. First, the authorities relied on by these judges do not similarly support such control on sentencing by members. Art. 16(1)(A) and (2)(A) and (B), UCMJ, 10 USC § 816(1)(A) and (2)(A) and (B). *See United States v. Deain*, 5 USCMA 44, 17 CMR 44 (1954). Thus, the integrity and reliability of a military accused's sentence would vary depending on the forum selected by him in total ignorance of this unknown judicial regulation. Such an intrinsically contradictory system of law would be neither uniform nor just. Second, such sentencing control conflicts with Congress' express delegation of the authority to set sentencing limits to the President in Article 56, UCMJ, 10 USC § 856. *See also* Art. 6a, UCMJ, 10 USC § 806a (1989). The absence of any recognition of this sub rosa punishment control in the Manual for Courts–Martial strongly suggests its invalidity. *See* RCM 104(b)(2)(B), Manual for Courts–Martial, United States, 1984. Third, neither Article 26(c) nor the decision in *United States v. Moorehead, supra,* nor fitness-report regulations provide express recognition of this unusual sentencing-policy power in the Judge Advocate General or his designee. Finally, the Judge Advocate General of the Navy has not asserted such unlimited power in this case and, in fact, has acted in a manner totally inconsistent with the minority judges' opinion. *See also* § 0165(c), Manual of the Judge Advocate General of the Navy (Change 5) (1986) [5]; RCM 109.

**5.** *Military judge*

  (1) *General*

    (a) The demands of military justice require that military judges maintain the highest standards of professional competence and ethical conduct. An indispensable component of such standards is the requirement that military judges exercise independent judgment, unhampered by fear of undue criticism, and unswayed by partisan or pecuniary interests. The Judge Advocate General is vested with the authority and concomitant obligations to ensure that such standards are maintained and to preserve the integrity of judicial independence.

    (b) The procedures prescribed herein provide a mechanism whereby the Judge Advocate General may ensure that judicial competence and conduct remain at the highest level, while preserving to the maximum extent possible the cherished concept of an independent judiciary.

    (c) *The procedures prescribed herein are not to be used to attack collaterally the merits of*

■ The opinion below concurring in the result also particularly attacks the majority opinion because of its purported extrapolation of dicta from our opinion in *United States v. Ledbetter, supra.* We state again today that the fitness-report system cannot be used as a conduit for command complaints against judge-alone sentencing.[6] We also conclude that the majority of the court below committed no legal error in finding for this reason that the Garvin Memorandum constituted command influence. The fact that this memorandum was not specifically directed at appellant's case does not detract from the legal correctness of the majority's conclusion. *See generally United States v. Thomas,* 22 MJ 388.

■ Turning finally to the question of prejudice, we also agree with the well-considered opinion of the majority of the court below. As noted there, the Judge Advocate General of the Navy immediately recognized this military-justice taboo and took prompt action to curtail the impact of the Garvin memorandum. *See generally 1 The Military Justice Act of 1983 Advisory Commission Report* 9 (Dec.1984). He instructed Circuit Judge Henderson to disregard Chief Judge Garvin's memorandum, and he replaced Chief Judge Garvin as Circuit Judge Henderson's rating officer. 30 MJ at 1265.[7] Moreover, Circuit Judge Henderson's earlier action of full disclosure of this matter to his fellow judges and notification of the Judge Advocate General

(*id.* at 1258) properly set the stage for an effective resolution of this problem. Art. 26(c). In addition, Judge Noren's trial disclosure of these events and disclaimer of any impact on him with opportunity for *voir dire* and challenge for the defense (30 MJ at 1264) was required conduct. *See* RCM 902. Finally, trial defense counsel, having been fully advised of this matter, nonetheless chose trial by judge alone (30 MJ at 1264) and clearly indicated this choice on the record. The efforts of all these naval officers protected not only appellant's rights to a fair trial but the integrity of the military justice system, as well. *United States v. Sullivan,* 26 MJ 442.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Senior Judge EVERETT concurs.

COX, Judge (dissenting in part and concurring in the result):

Except as to the result, I respectfully disagree with the majority opinions of this Court and of the Court of Military Review for three reasons.

First, I do not view Captain Garvin's letter as "unlawful command influence." I must recognize that it is extremely difficult to deal with this issue in light of the holding by the Court of Military Review

> that the "judges of the Transatlantic Judicial Circuit perceived Chief Judge Garvin's memorandum to Judge

---

*any substantive or procedural ruling of a military judge, or any other judicial decision reviewable under any provision of law.*

(d) It is the policy of the Judge Advocate General that any action or recommendation to revoke the certification of a military judge will normally be initiated only when other remedial measures, including punitive action, have failed to induce proper behavior or are inappropriate. In each stage of any proceedings concerning decertification of a military judge, full consideration shall be given to the effectiveness and appropriateness of such alternative measures as therapy, warning, instruction, and punitive action.

(Emphasis added.)

6. The two minority judges below misconstrue the purpose of appellate review in the military

justice system. It is not a vehicle to protect the professional reputation of military attorneys involved in command-influence cases. Moreover, it is not designed to implement or facilitate the routine bureaucratic functioning of the officer's fitness report system. These are responsibilities of the Judge Advocate General of the Navy. Art. 26(c), Uniform Code of Military Justice, 10 USC § 826(c). Our duty is to insure that servicemembers receive a fair court-martial in accordance with law. Art. 67, UCMJ, 10 USC § 867.

7. The Assistant Judge Advocate General of the Navy for Military Law communicated this intended action of the Judge Advocate General prior to July 29, 1988. The formal action was issued in September 1988. Appellant's trial was in August 1988.

Henderson as an attempt by their military superior to superimpose his personal judgment, influenced at least in part by disgruntled convening authorities, over the exercise of their independent judicial responsibility and discretion." [30 MJ at 1264]

We hold that Chief Judge Garvin's memorandum became a vehicle for the transmission of unlawful command influence. 30 MJ 1254, 1266–67 (1990) (citations and footnote omitted). Nevertheless, from my vantage point as a former trial judge, I view it as a frank communication between a Chief Judge and a trial judge concerning the work of the judges in the Transatlantic Circuit of the Navy. In any event, "command influence" must be judged from the intent of the speaker, not from the perceptions of the recipient, unless the recipients are indeed influenced. *United States v. Thomas,* 22 MJ 388 (CMA 1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). Here, the military judges obviously were not influenced.

Second, I do not subscribe to the theory that judges, even those who have life tenure, are deities. They are not above criticism. The question is, who does the criticizing? I believe that the office of the Chief Judge provides an appropriate position for dealing with the problems created by dissatisfied commanders or victims.

Dissatisfaction breeds contempt. Contempt breeds distrust. Distrust breeds circumvention. If we make it a federal crime, "unlawful command influence," for dissatisfaction to be expressed, then the dissatisfied parties will try to find ways to deal with military justice outside the judicial system. In some societies, the citizens take law and order into their own hands when they lose respect for the judicial systems. It is a sincere tribute to the Judge Advocates General of the Armed Forces of the United States that they have convinced commanders and servicemembers alike that our military justice system works. It also is a tribute that our Government has provided a system that gives servicemembers a fair trial which, at the same time, responds responsibly to the needs of good order and discipline within the military services.

In my judgment, one major reason the system works so well is that Congress created a trial judiciary. It works because the judges are carefully selected, well trained, and receive good logistical and administrative support. It works because there is a Chief Trial Judge administering the system. I see no legal or ethical impediment to allowing the Chief Trial Judge to communicate with the members of the trial judiciary. If a judge or group of judges are not behaving responsibly, such as squandering travel money, planning poorly, or scheduling all trials in the glamour ports of the world, they need to be told to stop it. If they are rude, arrogant, and treat lawyers, witnesses, and court members with disrespect, they need to be told to stop it. If they are creating dissatisfaction in the military community, they need to know it. Contrarily, if a judge is doing a good job, managing his or her work well, it makes sense to pass on the good news. There is a major difference between "influencing" a judge's decisions and "communication."

Lastly, the chief judges of the military trial judiciaries are sitting judges. In addition to their administrative and supervisory responsibilities, they preside over courts-martial. They and all of the judges are bound by Codes of Conduct as well as the Uniform Code of Military Justice. Canon 1 of the ABA Code of Judicial Conduct includes this very simple statement, "An independent and honorable judiciary is indispensable to justice in our society." A judge who lives by the Code cannot be unlawfully influenced by outside pressures. A good judge will accept criticism, reflect upon it, and hopefully render the best judgment possible, uninhibited by the dangers which lurk if his judgment does not please the community in which he must function. It is a very difficult job—and a very lonely job at times. I am not sure that words can express the feeling a judge has when he feels compelled to suppress the confession of a violent criminal, knowing that on the

following Sunday morning at church, he will be sitting across the aisle from the victim's family. We should not make it more difficult by cutting off the lifelines of communication between chief judges and the judges who serve with them.

The opinion of the court below and that of the majority of this Court contain many noble words and ideals; however, in my view, they represent an artificial and unreal world in which military judges simply do not operate. The solution to unlawful influence of military judges is not found in words; it is not found in creating tenure for them or isolating military judges from the world around them. The solution is found in selecting men and women of good character and integrity, persons who want to learn to do a good job, who want to make fair and just decisions, persons with sound judgment. I am satisfied that all of the military judges involved in this case, including Chief Judge Garvin, are such persons.