UNITED STATES

v.

Joey VILLAREAL, 462–87–5502, Aviation Ordnanceman Airman (E–3), U.S. Navy.

NMCM 96 01234.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 14 March 1996.

Decided 15 Oct. 1997.

Sefton, J., concurred in part and dissented in part and filed opinion.

658

Richard T. McNeil, Civilian Defense Counsel.

Mary Ramsay McCormick, Civilian Defense Counsel.

LCDR Eric C. Price, JAGC, USN, Appellate Defense Counsel.

LT Dale O. Harris, JAGC, USNR, Appellate Defense Counsel.

LCDR Christian L. Reismeier, JAGC, USN, Appellate Government Counsel.

Before DOMBROSKI, C.J., and SEFTON and OLIVER, JJ.

OLIVER, Judge:

This case is the result of the tragic, unintended death of a young Sailor at the hands of his best friend. On the evening of 6 January 1995, the two men senselessly engaged in a "game" similar to Russian roulette in their barrack's room at Naval Air Station, Whidbey Island. While the victim was talking on the telephone, the appellant spun the cylinder of the .32–caliber revolver a final time. The appellant pointed the weapon toward his friend and pulled the trigger. Having apparently deviated from their normal procedure of checking the position of the round to make sure it was "safe," this time the hammer fell on a live cartridge. The bullet travelled through the back of the victim's head, expending its destructive force in his brain. Shortly thereafter, he died.

Some months after the incident, Captain Schork, Commanding Officer, Naval Air Station, Whidbey Island, the original general court-martial convening authority (GCM CA), entered into a pretrial agreement (PTA).

The PTA would permit the appellant to avoid a charge of murder and would suspend any confinement in excess of 5 years.

A few days later, Captain Schork was speaking with an old shipmate and friend, who was then assigned as Chief of Staff, Commander, Naval Air Forces, Pacific (COMNAVAIRPAC). COMNAVAIRPAC was Captain Schork's reporting senior. After discussing the case, Captain Schork decided to withdraw from the pretrial agreement. On advice of his staff judge advocate to avoid concerns over possible unlawful command influence, Captain Schork transferred the case to Commander, Naval Base, Seattle (COMNAVBASE). Although the appellant was willing to enter into a new PTA on the same terms, he was unable to reach agreement with COMNAVBASE.

On 11–14 March 1996, a general court-martial composed of officer members convict-ed the appellant, contrary to his pleas, of failure to obey a lawful order by possessing a dangerous weapon, involuntary manslaughter, negligent discharge of a firearm, obstruction of justice, solicitation to obstruct justice, and carrying a concealed weapon, in violation of Articles 92, 119, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 919, and 934 (1994)[hereinafter UCMJ]. The members acquitted the appellant of murder [1] and willful discharge of a firearm. His sentence included confinement for 10 years, forfeiture of $400.00 pay per month for 10 years, reduction to the lowest enlisted pay grade, and a dishonorable discharge.[2] On 10 January 1996, COMNAVBASE approved the sentence as adjudged and, except for the dishonorable discharge, ordered it executed.

We have carefully reviewed the record of trial, the appellant's seven assignments of error,[3] and the Government's response there-

---

1. Charged as murder under Article 118(3), UCMJ, 10 U.S.C. § 918(3), as unlawfully killing a human being when he was engaged in an act that is inherently dangerous to another and evinces a wanton disregard of human life.

2. The military judge determined that several of the offenses—involuntary manslaughter and negligent discharge of a firearm, and obstruction of justice and solicitation to obstruct justice—were multiplicious for the purpose of sentencing. Therefore, she advised the members that the maximum punishment was confinement for 18 years, total forfeitures, reduction to the lowest enlisted pay grade, and a dishonorable discharge. Record at 357.

3. I. THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION TO DISMISS WHERE UNLAWFUL COMMAND INFLUENCE RESULTED IN APPELLANT'S PRETRIAL AGREEMENT BEING WITHDRAWN, AND THE MILITARY JUDGE SHOULD HAVE ABATED THE PROCEEDINGS UNTIL THE CONVENING AUTHORITY COMPLIED WITH THE TERMS OF THE PRETRIAL AGREEMENT.

    A. DISMISSAL WAS AN APPROPRIATE REMEDY WHERE UNLAWFUL COMMAND INFLUENCE RESULTED IN THE CONVENING AUTHORITY WITHDRAWING FROM THE PRETRIAL AGREEMENT IN BAD FAITH.
    B. BELIEVING DISMISSAL WAS TOO HARSH A REMEDY, THE MILITARY JUDGE WOULD NOT HAVE EXCEEDED HER AUTHORITY BY HOLDING THE PROCEEDINGS IN ABEYANCE UNTIL THE CONVENING AUTHORITY HONORED THE AGREEMENT ENTERED INTO BY CAPTAIN SCHORK.
    II. THE MILITARY JUDGE ERRED IN FAILING TO INSTRUCT THE MEMBERS THAT VOLUNTARY INTOXICATION IS A DEFENSE TO THE SPECIFIC INTENT OFFENSES OF OBSTRUCTION OF JUSTICE AND SOLICITATION.
    III. IN THE ALTERNATIVE, THE COURT SHOULD DISMISS SPECIFICATIONS 2 AND 3 UNDER CHARGE IV BECAUSE THE GOVERNMENT FAILED TO PROVE, BEYOND A REASONABLE DOUBT, THAT APPELLANT INTENDED TO OBSTRUCT JUSTICE OR INTENDED THAT ANOTHER COMMIT THE OFFENSE OF OBSTRUCTION OF JUSTICE.
    IV. THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION FOR A FINDING OF NOT GUILTY AS TO SPECIFICATION 4 OF CHARGE IV WHERE THE ONLY EVIDENCE THAT APPELLANT CONCEALED A WEAPON CAME FROM UNCORROBORATED ADMISSIONS IN APPELLANT'S CONFESSION.
    V. THE MILITARY JUDGE ERRED IN FAILING TO DEFINE "POSSESSION" FOR THE MEMBERS, AND THE GOVERNMENT FAILED TO PROVE, BEYOND A REASONABLE DOUBT, THAT APPELLANT VIOLATED A LAWFUL GENERAL ORDER PROHIBITING THE POSSESSION OF A DANGEROUS WEAPON WHERE, UNDER THE CIRCUMSTANCES OF THIS CASE, AE3 LEMAS' POSSESSION OF THE GUN IN THE SHARED BARRACKS ROOM SHOULD NOT BE IMPUTED TO APPELLANT.
    VI. THE MILITARY JUDGE ERRED IN INSTRUCTING THE MEMBERS THEY COULD CONVICT APPELLANT OF BOTH INVOLUN-

to. We heard oral argument on the first and seventh assignments of error. After careful consideration and except as discussed below, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. We will discuss each issue in order, and incorporate relevant additional facts into our analysis as appropriate.

### Unlawful Command Influence

The appellant first contends that the military judge erred when she denied his motion to dismiss or, in the alternative, to abate the proceedings until the new convening authority agreed to abide by the terms of the original PTA. We conclude that, under existing law, the appellant is not entitled to any relief.

During the motion stage of the trial, the appellant established a good case of apparent unlawful command influence. We believe that the military judge's essential findings of fact are well supported in the record and we adopt them as our own. *See* Military Judge's Essential Findings and Ruling on Motion to Dismiss for Unlawful Command Influence of 24 Jul 95 [hereinafter Findings].[4] The evidence indicates that the appellant and the original GCM CA, Captain Schork, had entered into a signed PTA on 10 April 1995, about 3 months after the shooting. The family of the victim wrote a 10–page letter which was, *inter alia,* strongly critical of any PTA which would permit the accused to avoid the murder charge. They sent copies of the letter to Captain Schork and a host of Senators, Congressmen, and senior military officials, including COMNAVAIRPAC. During

a subsequent telephone conversation with the Chief of Staff, COMNAVAIRPAC,[5] Captain Schork discussed the controversial nature of this letter. The Chief of Staff, who was personally not in favor of pretrial agreements, asked: "What would it hurt to just send it to trial and let the members decide?" Record at 13; *see* Findings at 2, ¶ 11. Shortly thereafter, on 13 April 1995, Captain Schork withdrew from the PTA.

The military judge was not convinced there was actual command influence. Having read the record of trial closely, neither are we. The letter from the victim's family was clearly designed to convince Captain Schork to change his mind and withdraw from the agreement. However, this did not constitute unlawful command influence. Indeed, a commander is supposed to take into account the concerns of victims and their families in determining the appropriate disposition of offenses committed under the UCMJ.[6] Likewise, there is nothing wrong with a convening authority advising his or her reporting seniors of the status of court-martial proceedings within their area of responsibility. In this case Captain Schork testified that he did not perceive the Chief of Staff's question as pressure to withdraw from the agreement. Record at 12, 16. However, in the area of unlawful command influence, appearances can be critical. *United States v. Rosser,* 6 M.J. 267, 271, 273 n. 19 (C.M.A. 1979); *see United States v. Johnson,* 46 M.J. 253, 254 (1997). Therefore, we have little doubt that, under the circumstances of this case, if the original GCM CA had continued

TARY MANSLAUGHTER AND THE UNLAWFUL DISCHARGE OF A FIREARM, AND BOTH OBSTRUCTION OF JUSTICE BY REQUESTING ANOTHER TO DISPOSE OF THE GUN AND SOLICITING ANOTHER TO OBSTRUCT JUSTICE BY DISPOSING OF THE GUN, WHERE THE LATTER ARE LESSER INCLUDED OFFENSES OF THE FORMER.

VII. A SENTENCE WHICH INCLUDES CONFINEMENT FOR TEN YEARS AND A DISHONORABLE DISCHARGE IS INAPPROPRIATELY SEVERE FOR THESE OFFENSES AND THIS APPELLANT.

4. For some reason, the military judge's Findings do not accompany the original record of trial. The appellant has attached a copy as an Appendix to his brief.

5. The Chief of Staff was also serving as Acting COMNAVAIRPAC. Captain Schork testified that he was not aware that COMNAVAIRPAC was out of town and therefore the Chief of Staff was Acting. He was simply calling up his boss' Chief of Staff and an "old friend and shipmate" to keep him advised of the status of his command.

6. In the present case Captain Schork testified that he was well aware of the opposition of the family, both before and after he signed the pretrial agreement. He did not withdraw from the agreement until after his telephone conversation, which caused him to rethink whether or not it was an appropriate way to resolve the case. Record at 15–18.

to dispose of these offenses and referred the case to a general court-martial, the military judge or this court would have granted appropriate relief.

In fact, however, judicial intervention to eliminate the appearance of unlawful command influence was not necessary. On 21 April 1995 Captain Schork, acting on the sound advice of his staff judge advocate, forwarded the charges to COMNAVBASE for disposition. *See* RULE FOR COURTS-MARTIAL 401(c), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.)[hereinafter R.C.M.]. Shortly thereafter COMNAVBASE, a neutral, independent GCM CA,[7] referred the charges against the appellant to a general court-martial. Despite pretrial negotiations, the appellant and the new GCM CA were unable to reach an agreement.[8] The appellant made a motion at trial to dismiss or, in the alternative, to enforce the provisions of the original PTA. Appellate Exhibit I; *see* Appellate Exhibit VII. After determining that the new GCM CA was untainted by any appearance of unlawful command influence and that the appellant had not relied to his detriment on the agreement, the military judge denied the appellant's motion. Record at 51–55.[9]

The appellant then filed a petition for extraordinary relief, which this court denied in September 1995 on the basis that the petitioner had not demonstrated the requisite showing of "extraordinary circumstances." *Villareal v. Ramsay*, No. 9501614, 1995 WL 935024 (N.M.Ct.Crim.App. 27 Sept. 1995)(unpublished decision). *See Gray v. Mahoney*, 39 M.J. 299, 304 (C.M.A.1994). Our superior court denied the appellant's writ appeal in November 1995, *Villareal v. Ramsay*, 43 M.J. 427, 427 (1995), and denied his petition for reconsideration in January 1996. *Villareal v. Ramsay*, 43 M.J. 476, 476 (1996); *see id.* at 476–77 (Sullivan, Judge, dissenting).

■ Because Captain Schork forwarded the charges to COMNAVBASE Seattle for disposition, the appellant's case started anew with a convening authority outside the original chain of command and unaffected by any perceived command influence. This prudent action ensured that the appellant's right to a fair trial was preserved. *United States v. Mabe*, 33 M.J. 200, 207 (C.M.A.1991)(unlawful command influence recognized, and where all parties fully disclosed involvement and implemented corrective measures, this action was found to be an effective resolution that protected appellant's right to a fair trial and the integrity of the military justice system).[10]

The appellant claims that COMNAVBASE must also have been tainted by the specter of unlawful command influence. Although he argues common sense and normal experience, the only evidence to which he can point in support of this proposition is the following language from a memorandum the COMNAVBASE Staff Judge Advocate wrote to the military judge:

> I informed [the convening authority] that no new information had come to light which altered our basic understanding of how the case came to be forwarded to him for disposition, or which would preclude his acting in the best interest of justice and fairness on the findings and sentence after the trial process performed its fact finding and adjudicative functions to fully inform that decision.

---

7. The record established that COMNAVBASE was the nearest GCM CA and was not in COMNAVAIRPAC's chain of command. Record at 15; *see* Findings at 4, ¶ e.

8. The petitioner was unable to secure a pretrial agreement with the convening authority similar to the one that Captain Schork had signed. The military judge encouraged the parties to see if an agreement could be reached so that the petitioner would be in the same position he had been in. Record at 44.

9. The military judge concluded that "[t]he 'taint' associated with the withdrawal from the PTA ..." was ostensibly cured when the case was withdrawn ... and forwarded to COMNAVBASE Seattle, a neutral Convening Authority outside the AIRPAC chain of command." Findings at 4, ¶ e.

10. Such a result (remand for a new trial convened by an untainted convening authority) is what this court would likely have ordered on post-trial appellate review had Captain Schork continued as the convening authority and unlawful command influence was found to have affected the appellant's trial. Thus, the appellant received the relief to which he might otherwise be entitled.

Appellate Exhibit 8 [sic] at ¶ 1. During oral argument, the appellant's counsel contended that the clear inference of this language is that the convening authority was well aware of the political sensitivity of the case and that Captain Schork had withdrawn from the pretrial agreement because of perceived pressure from COMNAVAIRPAC. We disagree. The plain import of this memorandum, taken as a whole, is the clear commitment COMNAVBASE Seattle had made to "justice and fairness . . ., both the appearance and reality. . . ." *Id.* Because we believe that transferring responsibility for this court-martial to COMNAVBASE Seattle purged any possible taint, we are "persuaded beyond a reasonable doubt that the findings and sentence have not been affected by command influence. . . ." *United States v. Thomas,* 22 M.J. 388, 394 (C.M.A.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). *See United States v. Black,* 40 M.J. 615, 619 (N.M.C.M.R.1994). Therefore, the cases the appellant has cited as the basis for granting relief are inapposite.

■ The appellant has also requested that this court direct specific performance of the terms of the PTA. Such specific performance is a recognized remedy where the accused enters pleas of guilty pursuant to a PTA and the Government fails to adhere to its obligations. *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971)(holding that where an accused had entered pleas and the prosecution failed to uphold its end of the bargain, the remedy was either remand for a new trial on the merits or specific performance of the agreement); *United States v. Penister,* 25 M.J. 148 (C.M.A.1987)(holding that the convening authority was bound to the sentencing limitation provisions of the PTA where accused fulfilled his obligations under the terms of the agreement). Under the facts of this case, however, we are unwilling to order this remedy.

R.C.M. 705(d)(4) provides that either the accused or the convening authority may withdraw from a PTA. The accused may do so "at any time" prior to his guilty pleas being accepted and, under appropriate circumstances, even after that. *See* R.C.M. 910(h). The convening authority is somewhat more limited. He "may withdraw from a pretrial agreement," *inter alia,* "at any time before the accused begins performance of promises contained in the agreement. . . ." R.C.M. 705(d)(4)(B). Unless we are prepared to rewrite R.C.M. 705 to deny the convening authority the right to withdraw from a pretrial agreement at any time prior to reliance for any reason, while continuing to permit the accused to withdraw "at any time" for any reason, we do not believe that an appellate court can hold the Government to its obligations under the bargain from which it has withdrawn in a timely manner. We are particularly unwilling to order specific performance in a case where the appellant decided to plead not guilty. The appellant enjoyed a convening authority unaffected by any perceived command influence and outside the original chain of command. *See Mabe,* 33 M.J. at 207. This removed the legal taint from any improper withdrawal.[11]

■ Of course, the result would have been different had the appellant detrimentally relied on one or more provisions of the PTA prior to the original GCM CA withdrawing from the PTA. Our higher court has opined that "principles of fairness and due process compel the Government to abide by a pretrial agreement on which an accused has reasonably relied to his detriment. . . . [D]etrimental reliance may include any action taken by an accused in reliance on a pretrial agreement which makes it significantly more difficult for him to contest his guilt on a plea of not guilty." *Shepardson v. Roberts,* 14 M.J. 354, 358 (C.M.A.1983) (citation omitted). *See* F.A. Gilligan and F.I. Lederer, Court-Martial Procedure § 12–60.00 (1991). However, the appellant admits that he did nothing in reliance on the original PTA during the 3–day period it was "in effect."

---

11. Although we can see no evidence whatsoever of unlawful command influence having effected Rear Admiral Herrera, we note that his successor as COMNAVBASE, Rear Admiral Center, took the convening authority's action in this case. Despite the appellant's clemency petition which requested that the convening authority give him the benefit of his original deal, the new COMNAVBASE decided not to do so. We are convinced that there was no possible taint.

Moreover, except for Judge Sullivan's dissenting opinion in *Villareal v. Ramsay,* 43 M.J. at 476–77 (Sullivan, Judge, dissenting), he has been unable to cite any authority to indicate why it would be illegal or improper for Captain Schork to withdraw from the PTA or why the Government should have to honor the original agreement. Under the Constitution, an accused does not have a right to specific performance of a plea bargain which the Government has breached; in such case, it is sufficient if the accused has the opportunity to plead anew. *Mabry v. Johnson,* 467 U.S. 504, 510–11, 104 S.Ct. 2543, 2548, 81 L.Ed.2d 437 (1984). *See Santobello v. New York,* 404 U.S. at 262–63, 92 S.Ct. at 498–99.

Indeed, the appellant never did anything in reliance on the PTA. He pled not guilty to all the offenses he was facing. He also insisted upon a trial with members. Both of these actions were inconsistent with his obligations under the original agreement. Although he now complains that this court should hold the Government to the terms of its bargain, he voluntarily and completely withdrew from any obligation he had. This court would be much more willing to accept the appellant's argument that he is entitled to specific performance under the original agreement if he had not withdrawn from his promise to plead guilty to some of the offenses and accept trial by military judge alone. The appellant cannot have it both ways.

We are aware that the staff judge advocate, in his memorandum to the military judge of 17 July 1995, stated that the accused did not have to perform any of his obligations under the original PTA to claim his right to seek relief from the convening authority in "law or equity." Appellate Exhibit 8 [sic] at ¶ 2. More significantly, in denying reconsideration of his petition for extraordinary relief, our higher court stated the following: "If warranted, the convening authority, the Court of Criminal Appeals, or this Court can grant appellant relief, regardless of his pleas to the charges and specifications, during the ordinary course of appellate review." *Villareal v. Ramsay,* 43 M.J. at 476. The appellant specifically relied on the representations of our higher court in making his decision to plead not guilty to all charges and specifications. Record at 66. However, by pleading not guilty, the appellant preserved any appellate issues which he may have raised during his trial. We believe the correct reading of this language is that the decision on the writ did not foreclose the appellant from having the pertinent issues reviewed anew during the normal post-trial process.

We note that the military judge promised the appellant that if he complied with his obligations under the PTA, she would write a clemency petition recommending that the new GCM CA comply with the Government's original obligations "as a matter of fairness." Findings at 4, ¶ h. While she recognized that this recommendation would not be binding, COMNAVBASE would no doubt have given it serious consideration. Once the appellant decided to plead not guilty and to insist on a trial before officer members, however, the military judge was under no moral or legal obligation to comply with her promise. Likewise, the Government was relieved of any moral or legal obligation to comport with the terms of the original PTA.

Accordingly, we conclude that the appellant is not entitled to the relief he is seeking—dismissal or specific performance. In the interests of justice, however, we will provide partial relief under Assignment of Error VII.

**Instruction on Voluntary Intoxication**

■ The appellant next contends that the military judge erred in failing to instruct the members on the defense of voluntary intoxication with respect to the two specific intent crimes, obstruction of justice and solicitation. He notes that the military judge did instruct on the issue of voluntary intoxication, "standing alone," as not being a defense to murder. *See* Record at 304.

■ After carefully considering the record, we do not believe that the evidence "reasonably raised" this potential defense. *See United States v. Watford,* 32 M.J. 176, 178 (C.M.A.1991). Such a defense is reasonably raised only where "there is 'some evidence' to which the members might attach credence." *Id.* (quoting *United States v.*

*Jackson,* 12 M.J. 163, 167 (C.M.A.1981))(other citations omitted). As this court has noted: "Mere intoxication is insufficient to raise the defense; rather, the intoxication must be to such a degree that the accused's mental faculties are so impaired that a specific intent cannot be formed." *United States v. Yandle,* 34 M.J. 890, 892 (N.M.C.M.R.1992) (citation omitted).

While there was evidence that the appellant had been drinking on the evening in question, there is no testimony or other evidence that he was drunk. In his statement to NCIS the appellant admitted: "I don't think I even got drunk last night." Prosecution Exhibit 4 at 2 (1 of 3). Moreover, his blood alcohol content, in two separate tests taken only hours after the incident, registered 0.00. Record at 235. The appellant never requested an instruction nor objected to the instructions the military judge gave. In the absence of plain error, this constituted waiver. *United States v. Czekala,* 42 M.J. 168, 171 (1995); *see* R.C.M. 920(f). Because the evidence never reasonably raised the issue and voluntary intoxication was never part of the defense's theory of the case, we find no plain error. The instructions the military judge presented were fully adequate to inform the members of their obligations and the standards they were to apply. This assignment of error is without merit.

### Failure of Proof Beyond a Reasonable Doubt

■ In his next assignment of error, the appellant contends that the Government failed to prove the appellant's guilt of obstruction of justice and solicitation beyond a reasonable doubt. We disagree.

After carefully reviewing the record of trial and the elements of these two offenses, we analyzed all of the offenses of which the appellant was found guilty for both legal and factual sufficiency under the principles contained in *United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987). Immediately after shooting his best friend, the appellant repeatedly asked another friend to help him by taking the gun. He even wrapped the gun in plastic before finally convincing the friend to take it away. As he was involved in this effort to remove the damning evidence from the scene, his best friend lay dying. We are personally convinced that the appellant is guilty of these offenses beyond a reasonable doubt. This assignment of error is without merit.

### Additional Assignments of Error

We have reviewed the next three assignments of error. After careful consideration, we conclude that each is without merit. We comment briefly.

■ We conclude that the admissions in the appellant's confession that he had carried a concealed handgun into the barracks were both corroborated and convincing such as to survive a motion for a finding of not guilty and establish the basis for a conviction as to this offense. The corroborating evidence raised "the inference of truth as to the essential facts admitted." *United States v. Cottrill,* 45 M.J. 485, 489 (1997). Moreover, the appellant never objected to the admissibility of the confession, thus waiving any objection on appeal. MIL. R. EVID. 304(d)(2)(A), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.).

■ We believe the evidence in the record clearly established that the appellant had "possession" of it within the common understanding of this panel of officer members. The military judge is not obligated to define every operative word during her instructions. At trial the appellant never requested an instruction as to the meaning of this word, probably because he was likely to benefit from any confusion in the members' minds between the victim's "ownership" of the weapon and the appellant's "possession." Absent plain error, which we do not find, the appellant's failure to request the instruction waives the issue on appeal. *Czekala,* 42 M.J. at 171; *see* R.C.M. 920(f).

■ Our analysis of the elements of the offenses of which the appellant was found guilty indicates that they were not multiplicious under the test our higher court articulated in *United States v. Teters,* 37 M.J. 370 (C.M.A.1993). Moreover, since they are not "facially duplicative," the appellant forfeited the issue on appeal because of his failure to raise a multiplicity-for-findings motion at tri-

al. *United States v. Lloyd,* 46 M.J. 19, 20 (1997). The military judge's determination that some of the offenses were multiplicious for sentencing worked in the appellant's favor by reducing the maximum punishment the members could impose. This court is not bound by this determination such as to set aside and dismiss the so-called "multiplicious" offenses unless we find them, in fact, to be so. *See United States v. Morrison,* 41 M.J. 482, 483 (1995)(noting that just because the military judge determines that offenses are multiplicious for sentencing does not necessarily mean they are multiplicious for findings).

**Inappropriately Severe Sentence**

In his final assignment of error, the appellant contends that the sentence he received is inappropriately severe. After careful consideration, we believe that, under our "awesome ... power of review ...," *United States v. Cole,* 31 M.J. 270, 272 (C.M.A.1990), he is entitled to some relief.

▆ In his brief the appellant discussed sentences in other cases of involuntary manslaughter. In those cases, the most severe sentence was 5 years, with most sentences considerably less. The appellant also notes his lack of any intent to injure his best friend and his sincere and lasting regret. Finally, he emphasizes his otherwise sterling military career. At the same time, we have reviewed the compelling testimony of the victim's family members. Moreover, we are aware that the appellant was convicted of several other serious offenses, including failure to obey a lawful general order by possessing a dangerous weapon, carrying a concealed weapon, and obstruction of justice. Therefore, we would normally be unwilling to disturb a legal sentence which a court-martial had adjudged and a convening authority had approved, because it would be an improper exercise in clemency, which is not our role. *United States v. Healy,* 26 M.J. 394, 395 (C.M.A.1988). *See* R.C.M. 1107(b)(1). This general court-martial considered this sentence to be appropriate, taking into account the evidence as to the nature of the offenses

and the offender. *See United States v. Snelling,* 14 M.J. 267, 268 (C.M.A.1982)(citing *United States v. Mamaluy,* 10 C.M.A. 102, 106–07, 27 C.M.R. 176, 180–81, 1959 WL 3587 (1959)). Moreover, so did the convening authority, who approved the adjudged sentence on 10 June 1996.

▆ On the other hand, this court has a statutory obligation to ensure justice and preserve both the reality and appearance of fairness of the military justice system. *United States v. Claxton,* 32 M.J. 159, 162 (C.M.A.1991). The Court of Military Appeals has described our broad authority under Article 66(c), UCMJ, 10 U.S.C. § 866, as an "awesome, plenary, *de novo* power of review...." *Cole,* 31 M.J. at 272. *See United States v. Parker,* 36 M.J. 269, 271 (C.M.A.1993)(noting that this court is "something like the proverbial 800–pound gorilla when it comes to [its] ability to protect an accused.") In this case, Captain Schork admitted that he believed that the pretrial agreement, which would have capped the appellant's confinement at 5 years, was "fair." Record at 10. The military judge believed that it was unfair for the Government to unilaterally withdraw from a pretrial agreement, based on what could appear to be pressure from a higher commander.[12] Judge Sullivan observed that the withdrawal from the PTA in this case was "wrong" and not "due process of law." He continued: "Surreptitious influence from a superior officer should not void a properly executed PTA under the UCMJ." *Villareal v. Ramsay,* 43 M.J. at 477 (Sullivan, Judge, dissenting).

Although neither we nor the majority of our superior court were willing to impose a "good cause" requirement on the right of a convening authority to withdraw from a PTA under R.C.M. 705(d)(4) or alter the present state of the law to impose a remedy of specific performance on these facts, we still have the power to remedy any appearance of injustice. As discussed above, we believe that the appellant was largely made whole by having his court-martial referred to trial by a neutral, disinterested GCM CA unaffected by

---

**12.** The military judge opined that the facts of this case "at least" raised the appearance of "bad faith withdrawal from the PTA." Findings at 3, ¶ b. *See id.* at 4, ¶ h.

any tarnish of apparent unlawful command influence. *See Mabe*, 33 M.J. at 207. This resolved the legal complications from any apparent unlawful command influence as well as any improper withdrawal. However, we are not convinced that these laudable actions fully rectified the specter of apparent unlawful command influence in the eyes of practitioners of military justice or the American public in general. *See United States v. Weasler*, 43 M.J. 15, 19 (1995). As a result, we believe it appropriate to provide some relief. In performing our role under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to approve only those sentences which we believe "should be approved," we have reassessed the sentence in this case. This action is not based on clemency, but rather on our power and responsibility to seek and do justice and to protect the integrity of the military justice system. *Weasler*, 43 M.J. at 16, 19. We have provided appropriate relief in our decretal paragraph.

## Conclusion

Accordingly, we affirm the findings. However, we affirm only so much of the sentence, as approved on review below, as includes a dishonorable discharge, confinement for 7 years, 6 months, forfeiture of $400.00 pay per month for 7 years, 6 months, and reduction to the lowest enlisted pay grade.

Chief Judge DOMBROSKI concurs.

SEFTON, Judge, concurring in part and dissenting in part:

I join with the majority, save for the disposition of the final assignment of error in which appellant contends that his adjudged and approved sentence was inappropriately severe. The facts clearly demonstrate that appellant caused the death of a fellow sailor, his best friend. The events occurred in a Navy enlisted billeting area. The instrumentality of death was an unregistered and unlawfully possessed loaded personal weapon, which appellant was intentionally handling. He did so after at least some consumption of alcohol, in a manner ultimately inimical not only to good order and discipline, but, unfortunately, to Petty Officer Lemas' life.

The approved sentence below reflects consideration of the unwarranted death of a member of the naval service which occurred under circumstances which do not give rise to passionate sympathy from within the profession of arms. It adequately responds to the evidence adduced at a trial both on the merits and in pre-sentencing. Horseplay with a weapon, especially one known to have been loaded with live ammunition, goes well beyond the pale of chance and accident. Proper care and handling of weapons is fundamental to military life. To engage in prolonged horseplay over a period of hours, even with the "safeguards" employed by these "players" in the "game," exacerbates, rather than mitigates, the conduct of which appellant has been found guilty and sentenced. The prior good performance of appellant as a Sailor and his sincere regret at the outcome of his actions do little to diminish the impact of them.

While I am sympathetic to appellant's wish to have the benefit of his earlier bargain, he must live with the choices he voluntarily made when he went to trial. I diverge from the majority in its conclusion that appellant was only "largely" made whole by the referral of his case to a new convening authority after the earlier appearance of possible command influence. By the very act of removal of any possible taint of unlawful command influence, appellant entered the arena once again on an even keel, with no predisposition or commitment—either on his part, or that of the new convening authority. In short, I believe he was made completely whole and given his due. The first convening authority, doubtless with wise counsel from his staff judge advocate, excised all appearances of unlawful command influence and its pernicious taint. True, no bargain was struck with the new convening authority. Appellant opted to proceed with trial on the merits of all offenses alleged, and was tried before impartial members about whom he does not complain. These factors all weigh in favor of his having been justly treated. He asked for and received his day in court without taint of partiality or unlawful command influence. While I am confident that he has a genuine retrospective desire to receive the benefit of the bargain struck in the first instance, I find

no basis in law or equity for that, nor can I join in the majority's attempt to "split the baby" and find a middle road between the earlier abortive bargain and actuality.

I would affirm, without modification, both the findings and the sentence imposed by the members of the court and approved below by the convening authority. I find no cogent reason to exercise our "awesome ... power of review ...." under the facts and circumstances of this case, and believe the exercise here to be an exercise in clemency, which is not our role. *Cole,* 31 M.J. at 272; *Healy,* 26 M.J. at 395. In short, in this instance, the proverbial gorilla should remain at rest.